Argued and submitted April 9,
affirmed November 4, 1980

# MARJORIE A. HALL,

*Respondent,*

*v.*

# STATE OF OREGON,

*Petitioner.*

## (No. A7706-08646, CA 12599, SC 26695)

619 P2d 256

James M. Brown, Assistant Attorney General, Salem, argued the cause for petitioner. With him on the briefs were James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

Gregory P. Lynch, of Lynch and Siel, P.C., Portland, argued the cause for respondent. With him on the brief was Nancy W. Campbell, certified law student.

Before Denecke, Chief Justice, and Howell, Lent, Peterson and Tanzer, Justices.

DENECKE, C. J.

## DENECKE, C. J.

The issues in this negligence action against the state of Oregon are related to, although not the same as, those before us in *Stevenson v. State of Oregon,* also decided today. In both cases the state is contending that, as a matter of law, it is not liable for injuries allegedly caused by the state's creation of dangerous highway conditions. In *Stevenson* the state's position was that it was immune from liability under the circumstances. In this case its position is that even if there is no immunity, there is no evidence from which a jury could find that the state, acting through its employes, was negligent in failing to remove sand from a state highway.

The plaintiff in this case sought damages for personal injuries sustained when the car in which she was a passenger went out of control on the banked curve of the entrance ramp to Interstate 80 off the Morrison Bridge in Portland. There was evidence from which the jury could find that the driver lost control because the car encountered sand on the dry pavement and that the sand had been placed there by highway maintenance crews in late November or early December of 1976. The jury could further find that the icy conditions which had created a need for the sand were over by December 3 and that highway maintenance crews had not swept the sand from the ramp by December 13 when the accident occurred.

At the close of plaintiff's case the state rested without presenting any evidence and moved for a directed verdict. The trial court granted the motion on the ground that the evidence was not sufficient to permit the jury to determine whether, by December 13, the state had had a reasonable time in which to remove the sand from the ramp. The Court of Appeals reviewed the evidence and held there was evidence from which the jury could find the state did not use reasonable care:

"There is evidence from which the jury could have found that defendant had a duty to sweep the sand it had spread based on its knowledge of the danger the sand presented to motorists. The general standard of care is the necessary complement of duty. The standard of care required of defendant is that it act as a reasonable person

would under the circumstances. This is a question of fact. From the evidence presented the jury could have determined that the priority given to sand removal on this particular ramp was unreasonable. In this instance the jury was capable of deciding what was reasonable conduct. The plaintiff had made a prima facie case of negligence and it was error for the trial court to direct a verdict for defendant." 43 Or App 325, 602 P2d 1104 (1979).

We granted the state's petition for review.

The state does not contest the Court of Appeals' conclusion that the jury could find that the sand, on dry pavement, constituted a hazard and that the state had a duty to sweep it up within a reasonable period of time. The state's position is that the evidence was not sufficient to permit the jury to determine what a reasonable time would be.

Plaintiff's evidence showed that the ramp in question was within the areas assigned to two highway maintenance districts. The depositions of the maintenance supervisors of both districts were in evidence. The supervisors testified that the sand had been distributed throughout both maintenance districts during a brief period up to December 3. Neither supervisor was able to determine from his records whether his crew had spread the sand on this ramp. One supervisor testified that between December 3 and December 13, the date of the accident, his crew spent two days and part of a third on sweeping operations. During this same period there were four weekend days during which no sweeping was done. The jury could have found, however, that maintenance work of some kind was performed on at least two of those days. Two days were spent filling potholes, a part of one day the crew was dealing with high water and drainage problems caused by rain, and one day was spent picking up supplies for devices called "impact attenuators," which the supervisor characterized as an "emergency item" which needed to be repaired immediately. There was evidence that the potholes had "showed up all over," but no testimony as to where they were or the degree of hazard, if any, that they presented.

In the other maintenance area, its supervisor testified, the crew engaged in sweeping operations during

every week of that period except Friday, December 10. He not say what his crew was doing on that day or whether any of his employes worked on the weekends.

The evidence showed that each of these highway maintenance districts had one mobile sweeper and a crew of approximately 10 men. One of the supervisors described the equipment and crew necessary for sweeping operations:

"There was—sweeping operation requires a total of four pieces of equipment, four men. Sometimes you can get by with three if you have—during rain. * * *.

"* * * * *.

"First have a small truck ahead of the sweeper picking up the large objects in the road that would clog the sweeper, then a water tank which wets down the area, then the sweeper and then a truck behind where they—with an arrow board and sign on it, 'Sweeper Ahead.'"

The supervisor's testimony was uncertain as to how the order of sweeping operations within their districts was determined. One supervisor testified that sweeping usually starts in the areas where the most sand has been put out. Later he testified that curbed areas are swept before open areas, and that median lanes on the freeway are also high priority areas. There was evidence from which the jury could find that at the place where the accident occurred the ramp had curbs on both sides which would tend to confine sand on the surface to the traveled area of the highway. The supervisor testified, however, that this ramp and others would be among the last areas to be swept. Still later he testified that when sand was

"* * * spread all over the section on places like this was, you wouldn't run around and just pick up and sweep each place you had sanded. You would get it in with your normal sweeping on the section."

And finally, when asked whether sweeping operations would be ordered on the basis of what are "high priority areas," he answered:

"No. We make a section patrol and a foreman or supervisor is expected to make it at least once a week completely over his section looking for road conditions and where the maintenance is needed and different work has to be done."

The other supervisor testified that the sand was swept from the freeway system before other roads were swept. He also testified that high priority was given to areas like the Interstate Bridge which have "no shoulders, no place for the sand to go." He also testified that "We generally start on the Interstate Bridge and work south" and that the ramps were not generally swept during this process.[1] When sweeping, he said, "We have an established — start at once place and generally go right through * * *."

On the question of how long it takes to sweep up sand, the testimony came from a single witness. One supervisor, when asked how long it would take to sweep up the amount of sand that would be distributed during four days of sanding operations, answered that if there were no other emergencies and no equipment breakdowns it would "probably take two or three weeks to clean it up." Later he testified that five days of sweeping would have been enough to clean up all the sand which had been distributed in his section during the days just prior to December 3.

To summarize, the jury had before it evidence that sand on dry pavement constitutes a hazard to motorists, evidence which would permit a finding that the hazard could be greater on this ramp than on other kinds of highway areas, and evidence from which it could find that the curbing on this ramp would prevent the dry sand from being thrown off the traveled portion of the roadway by the traffic. There was also evidence of the amount of equipment and the size of the crew necessary for sand sweeping operations, of the equipment and crew available, and of the amount of time spent on sweeping between December 3 and the time of the accident. In the case of one maintenance district there was evidence of what the crew was doing on most of the days when as not sweeping; as to the other district there was no such evidence. Finally, there was evidence from which the jury could infer that the sand on this ramp could have been removed, given the equipment and crew available, prior to the time of the accident.

---

[1] He later testified, however, that "we make a special point in sweeping" the ramps. The jury was not required to believe this testimony and reject his testimony to the contrary.

In arguing that plaintiff did not make out a prima facie case of negligence, the state appears to be contending for a special standard when governmental entities are defendants. Although the issue of discretionary immunity, which we considered in *Stevenson v. State, supra,* is not directly involved in this appeal, some of the state's arguments would fit more comfortably within the discretionary immunity analysis than they do within the normal negligence framework. The state contends that if the Court of Appeals' decision is allowed to stand the jury could "impose liability if it found that the state should have put on extra crews or provided extra equipment or overtime to remove sand," and that the jury "would be allowed to review choices that properly rest elsewhere." The Court of Appeals' opinion, the state complains, "renders possible broad jury review of [governmental] maintenance priorities" and "does not confront the nature of governmental resource allocation choices involved nor the extent to which those choices relate to plaintiff's claim of negligence." Compare *Stevenson v. State of Oregon, supra,* 290 Or at 3.

In order to properly evaluate these kinds of contentions, we think it will be helpful to analyze this case in the first instance as though the defendant were a private party and the injury had occurred on a private bridge and roadway system. After addressing the problem of the standard of care in that hypothetical context, we will consider whether a different analysis is required because the defendant is the state.

Not surprisingly, we have found no cases involving similar facts in which the defendant was a private party. There are, however, many cases in which a claim for damages is based on an alleged hazard created by transitory conditions which the occupier of land has a duty (at least to invitees) to discover and remedy within a reasonable time. Our own decisions in such cases contain no indication that plaintiff's prima facie case must include direct evidence to inform the jury what would be a reasonable time in which to take action. If there is evidence to support the other elements of plaintiff's case, it seems to be understood that a jury question is presented when plaintiff

has shown the nature of the hazard and that it existed for a period of time sufficient that appropriate action might have been taken. *See, e.g. McVaigh v. Sandberg,* 266 Or 409, 513 P2d 801 (1973) (plaintiff slipped and fell on floor of defendants' drug store; evidence that new floor wax had been used and that defendants knew other people had slipped on the floor); *Bertrand v. Palm Springs,* 257 Or 532, 480 P2d 424 (1971) (plaintiff slipped and fell on wet floor in dressing room in defendants' health spa; defendant knew water tended to collect in the area and had instructed attendant to mop floor every 15 to 30 minutes); *Pribble v. Safeway Stores,* 249 Or 184, 437 P2d 745 (1968) (customer slipped and fell just inside store's entrance where water brought in by customers on rainy day made tile floor slippery); *McKinley v. Steinbeck,* 224 Or 278, 355 P2d 263 (1960) (plaintiff slipped on ice on steps outside defendant's motel; defendant either saw or should have seen the ice when he inspected the steps earlier the same morning). *Compare Pavlik v. Albertson's, Inc.,* 253 Or 370, 374, 454 P2d 852 (1969) (no evidence to indicate whether lettuce leaf had been on supermarket floor "a few seconds, or a few hours"); *Cowden v. Early,* 214 Or 384, 327 P2d 1109 (1958) (no evidence to permit finding that hotel owner had any opportunity to learn of water on stairway landing).

In *Lopp v. First National Bank,* 151 Or 634, 51 P2d 261 (1935), we held that plaintiff had made a prima facie case when there was no direct evidence as to how long the slippery substance which caused her fall had been on defendant's floor. Plaintiff testified that defendant's manager, who helped her to her feet after the fall, said "I told them to clean that up and they haven't done it." The majority was of the opinion that the jury could have concluded, from that remark, that there had been sufficient time to clean up the floor. The opinion indicates that it was up to the defendant to rebut that permissible inference:

"* * * At any rate no one would know better than the bank manager whether there was reasonable time in which to comply with his order, and he is silent on that subject. * * *." 151 Or at 640.

In some jurisdictions there is frequent litigation involving the liability of private defendants for injuries allegedly caused by negligent failure to remove ice or snow

from premises under their control. Although such cases may be taken from the jury on various grounds, we have found no suggestion that plaintiffs have been required, in order to avoid a nonsuit or directed verdict, to provide direct evidence of what would have been a reasonable time in which to alleviate the hazard. *See, generally,* Anno, Liability for Injuries in Connection with Ice or Snow on Nonresidential Premises, 95 ALR3d 15 (1979).

■ ■    The trial judge seems to have been of the opinion that expert testimony was necessary in order to inform the jury what would be a reasonable time within which to remove the sand. Expert testimony is an indispensable part of plaintiff's case only when the average juror cannot be expected to understand the issues without that kind of assistance. It is not required simply because the circumstances are outside the average juror's experience if the other evidence is such as to present the issues in terms which the jury can be expected to understand. *Lynd v. Rockwell Manufacturing,* 276 Or 341, 349, 554 P2d 1000 (1976); *Simpson v. Sisters of Charity of Providence,* 284 Or 547, 557, 588 P2d 4 (1978). Although the need for and logistics of highway sand removal are outside the probable experience of the average juror, there was evidence in this case informing the jury of the safety reasons for performing the task, the hazards of leaving it undone, the relative hazards among various kinds of highway areas, the way in which the job of sweeping highways is done, and the amount of time spent on that task during the relevant period. There was evidence from which the jury could find that the maintenance crews had not swept the more hazardous areas, including this ramp, before sweeping areas in which the danger was less. There was also some direct evidence from which the jury could conclude that the sand on this ramp could have been removed within that period. There is nothing about the issues presented by this kind of evidence which is beyond the capacity of jurors to understand without the assistance of experts.

■    Before this court the state does not argue that expert testimony was required, but contends that plaintiff, in order to show that the state acted unreasonably in failing to remove the sand prior to the day of the accident,

must present evidence that removing sand was more urgent than the other tasks which highway maintenance crews were performing when they were sweeping the highways. In our examination of analogous cases, we have found no suggestion that proof of that kind is part of plaintiff's prima facie case when a private defendant is alleged to be negligent. Although it is part of plaintiff's burden in a negligence case to persuade the trier of fact that the defendant acted unreasonably, plaintiff is not ordinarily required, in order to make a prima facie case, to negate the possibility that there were special circumstances which made the defendant's conduct reasonable. It is up to the defendant to produce evidence to rebut a permissible inference of negligence by showing that there were good reasons why it did not in fact take a precaution that, according to plaintiff's proof, it might reasonably have taken.

It is, of course, impossible to state accurately in general terms a rule for determining precisely when a plaintiff has produced enough evidence to permit a finding that defendant did not act reasonably. We are persuaded, however, that sufficient evidence was produced in this case. The kind of evidence which the state suggests we should require is much more likely to be available to the defendant than to the plaintiff. It is not surprising that we have found no authority suggesting that it is a necessary part of plaintiff's case.

■ We conclude that were the defendant a private party the plaintiff's evidence in this case would be sufficient to survive a motion for a directed verdict. There remains the question whether the analysis should be any different because the defendant is the state rather than a private party. We hold that it should not.

■ The legislature has provided that, except as otherwise limited by the statutes, all public bodies are liable for their torts. ORS 30.265(1). There is no suggestion in the tort claims act that where a public body's potential tort liability is based on negligence the plaintiff's proof is to be evaluated by any stricter standards than in negligence cases generally.

■ The concerns expressed by the state in support of its argument for a more stringent standard were addressed by the legislature and accommodated in ORS 30.265(3)(c), providing for immunity of public bodies from tort liability based on the exercise of governmental discretion. For example, under that provision as we have construed it in *Stevenson v. State, supra,* the the state could not be held liable on the ground that the legislature should have allocated funds sufficient to provide the highway maintenance divisions with more equipment or larger crews.[2] Neither the pleadings nor plaintiff's evidence in this case attempts to predicate liability on conduct which was undertaken as the result of a decision reached in the exercise of governmental discretion as described in *Stevenson.*

The Court of Appeals was correct in holding that the state's motion for directed verdict should have been denied and in remanding the case for a new trial.

The decision of the Court of Appeals is affirmed.

---

[2] No such contention has been made in this case. Even so, after hearing the evidence and argument the trial judge could, if it seemed necessary, give a cautionary instruction to the jury.