Argued and submitted October 26, 2001, reversed and remanded with instructions on appeal; affirmed on cross-appeal June 5, 2002

Mayola WILLIAMS,
Personal Representative of the Estate of
Jesse D. Williams, Deceased,
*Appellant - Cross-Respondent,*

*v.*

PHILIP MORRIS INCORPORATED,
*Respondent - Cross-Appellant,*

*and*

RJ REYNOLDS TOBACCO COMPANY,
Fred Meyer, Inc.,
and Philip Morris Companies, Inc.,
*Defendants.*

9705-03957; A106791

48 P3d 824

46

James S. Coon argued the cause for appellant - cross-respondent. With him on the briefs were Raymond F. Thomas, Douglas A. Swanson, and Swanson, Thomas & Coon; William A. Gaylord, and Gaylord & Eyerman, P.C.; and Charles S. Tauman, Maureen Leonard, Kathryn H. Clarke, and Bennett, Hartman & Reynolds.

William F. Gary argued the cause for respondent - cross-appellant. With him on the briefs were Sharon A. Rudnick, James E. Mountain, Jr., and Harrang Long Gary Rudnick, P.C.

James N. Westwood, Scott E. Crawford, and Stoel Rives LLP, filed the brief *amicus curiae* for Associated Oregon Industries.

David F. Sugerman, and Paul & Sugerman, P.C., and Steven C. Berman, filed the brief *amicus curiae* for Alliance for Lung Cancer Advocacy, Support and Education; American Lung Association of Oregon; American Heart Association; American Cancer Society; and Oregon Trial Lawyers Association.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

EDMONDS, P. J.

**EDMONDS, P. J.**

Defendant Phillip Morris, Inc., is this country's largest manufacturer of cigarettes. Plaintiff is the widow and personal representative of the estate of Jesse Williams (Williams), who began smoking defendant's cigarettes in the early 1950s and continued until his death from a smoking-related lung cancer in 1997. Plaintiff brought this action to recover compensatory and punitive damages for Williams's death. The jury found for plaintiff on her claims of negligence and fraud, awarding economic damages of $21,485.80 and noneconomic damages of $800,000 on each claim. On the negligence claim, it found that Williams' negligence was 50 percent of the cause of his harm and declined to award punitive damages. It awarded punitive damages of $79.5 million on the fraud claim. The trial court reduced the punitive damages award to $32 million, on the ground that the jury's award was excessive under the United States Constitution, and reduced the award of noneconomic damages to $500,000 in accordance with ORS 18.560(1). *See Greist v. Phillips*, 322 Or 281, 906 P2d 789 (1995). It then entered judgment on the fraud claim as modified.[1] Plaintiff appeals, assigning error to the reduction of the punitive damages award. Defendant cross-appeals, assigning error to a number of rulings relating to both the fraud and negligence claims. We reverse on the appeal, affirm on the cross-appeal, and remand for the trial court to enter judgment accordingly.

■ Because of the jury's verdict, we state the facts most favorably to plaintiff, drawing all reasonable inferences in her favor. *Northwest Natural Gas Co. v. Chase Gardens, Inc.*, 328 Or 487, 490-91, 982 P2d 1117 (1999). We first describe the facts relating to Williams himself, reserving most of the facts relating to defendant's conduct for our discussion of the various legal issues that the parties raise. Williams began smoking Phillip Morris cigarettes while he was in the Army in Korea in the early 1950s. The Army provided the cigarettes, and other soldiers told him that the smoke would help keep mosquitoes away. He smoked them until the mid-1950s,

---

[1] The court did not reduce the award of compensatory damages on the fraud claim to reflect the jury's finding of comparative fault, which it would have done if it had based the amount of the judgment on the negligence claim. *See* ORS 18.470.

when he switched to Marlboros, another Phillip Morris brand. He made the switch about the time that defendant repositioned the Marlboro brand from one that was oriented toward women to one of the first male-oriented filter cigarettes. Williams continued to smoke Marlboros or Marlboro Lights for the rest of his life,[2] ultimately increasing to three packs a day. At that point he was spending half of his waking hours smoking.

Both Williams' wife and their children encouraged him to stop smoking, telling him that cigarettes were dangerous to his health. In response, he insisted that the cigarette companies would not sell cigarettes if they were as dangerous as his family claimed, and he stated that he had heard on television that cigarettes do not cause cancer. He quoted to them from what he said he had heard about why cigarette smoking was not harmful to a smoker's health. He also told his wife, "the tobacco company, they never said that anything like this is going to harm you. They never said there was anything wrong with the tobacco." When one of his sons would try to get him to read articles about the dangers of smoking, Williams would respond by finding published assertions showing that cigarette smoking is not dangerous.

Williams nevertheless made several unsuccessful attempts to stop smoking, trying various methods that included quitting "cold turkey," reducing the number of cigarettes, using nicotine patches, and using nicotine gum. He did not persist in any of those attempts for a significant time period. Williams' desire for cigarettes was so strong that, if he ran out of cigarettes during an ice storm, he would go to a store for cigarettes, despite the hazards of traveling in such conditions, even if he had no other reason to leave his residence. When his wife prohibited smoking in the family home, he went outdoors to smoke. At restaurants, he would leave his wife in the nonsmoking section during the meal in order to have a cigarette in the smoking section. His smoking was the major source of tension between Williams and his wife. According to an expert witness, Williams was highly addicted

---

[2] There is some indication that Williams may have occasionally smoked other Phillip Morris brands. There is no evidence that he smoked non-Phillip Morris cigarettes other than incidentally.

to cigarettes, and that addiction was physiological as well as psychological.

Williams was generally in good health and rarely saw a physician. However, in late 1995 and early 1996, he developed a cough and began, at times, to spit up blood. A radiologist interpreted chest X-rays taken at that time as normal.[3] The problem recurred a few months later, and he began losing weight. X-rays and other tests in September and October led to a diagnosis of an inoperable poorly differentiated adenosquamous carcinoma in Williams' right lung. According to expert testimony, the primary cause of that kind of cancer is cigarette smoking.[4] When Williams learned of the diagnosis, he expressed a feeling of betrayal. He said, "those darn cigarette people finally did it. They were lying all the time." He wanted to let other people know that they were being deceived about the harm that cigarettes could do to them. Williams received chemical and radiation therapy that provided only temporary benefits, and he died in March 1997.

Because plaintiff's appeal relates solely to the reduction of the punitive damages award, we begin with defendant's cross-appeal. Defendant first assigns error to the trial court's denial of its motion for directed verdict on plaintiff's fraud claim. Resolving that assignment depends on understanding plaintiff's theory concerning how defendant made material misrepresentations of fact, how the misrepresentations were made to Williams, and how he relied on them. In Oregon the elements of fraud are:

> "(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; (9) and his consequent and proximate injury."

---

[3] Both plaintiff's and defendant's radiologists at trial agreed that, viewed in retrospect, those X-rays showed a tumor. The course of Williams' cancer would not have been different if it had been diagnosed at that time, according to the testimony.

[4] Defendant's experts testified that Williams had an extremely rare form of lung cancer that is not related to smoking. Plaintiff presented contrary evidence, and the jury by its verdict implicitly accepted plaintiff's view.

*Conzelmann v. N.W.P. & D. Prod. Co.*, 190 Or 332, 350, 225 P2d 757 (1950).[5] A plaintiff must prove each element of the tort by clear and convincing evidence, or evidence that establishes that the truth of the facts alleged is highly probable. *Riley Hill General Contractor v. Tandy Corp.*, 303 Or 390, 392, 402, 737 P2d 595 (1987).[6]

■ Also, the trial court held that two separate legal principles impose significant limitations on plaintiff's claims. First, ORS 30.905(1), the statute of ultimate repose, extinguishes claims for injuries that occurred more than eight years after a product is first purchased. Plaintiff therefore had to prove that the cigarettes that Williams purchased after September 1, 1988, which the parties treated as eight years before his injury, were a substantial factor in causing his cancer and death. Secondly, under 15 USC § 1334, the federally required warning that appears on each cigarette package preempts all state regulation of the advertising and promotion of cigarettes that carry the warning. In *Cipollone v. Liggett Group, Inc.*, 505 US 504, 524, 527-28, 112 S Ct 2608, 120 L Ed 2d 407 (1992), the United States Supreme Court held that the preemption extends to state common-law claims as well as to state statutes and regulations. Thus, plaintiff may not base her fraud claim on allegations that defendant fraudulently concealed information concerning smoking and health. She is limited to allegations of affirmative misrepresentations. Neither party challenges on appeal the trial court's rulings regarding the statute of ultimate repose and the effect of 15 USC § 1334.

Defendant's primary argument on cross-appeal focuses on the first, seventh, and eighth elements of fraud, involving the alleged representations and Williams' reliance on them. Defendant asserts that there is no evidence that it made *any* representation to Williams or that Williams relied

---

[5] The Supreme Court has suggested that those nine requirements may unduly fractionalize the essential elements of a fraud claim. For example, proof of reliance on a fraudulent statement may be sufficient in itself to prove the hearer's ignorance of the falsity of the statement. *See Briscoe v. Pittman*, 268 Or 604, 610, 522 P2d 886 (1974).

[6] A plaintiff may prove compensatory damages arising out of the fraud by a preponderance of the evidence. *Riley Hill General Contractor*, 303 Or at 392-93. Punitive damages require proof by clear and convincing evidence. ORS 18.537(1).

on any representation that it may have made. Defendant asserts,

> "The essence of a claim of fraud is a communication by the defendant which is received and relied upon by the plaintiff. As Plaintiff acknowledged, she could not prove any such communication by Phillip Morris to Williams. Therefore her fraud claim fails."

Defendant interprets the requirement that plaintiff rely on a misrepresentation as meaning that "an alleged false representation must be identified specifically so that it can be critically examined." According to defendant, plaintiff cannot prove her claim without proof that defendant made a specific misrepresentation to Williams.

Defendant interprets the cases on which it relies for support as standing for more than they do. The cases that defendant cites either simply repeat the requirement that there be a misrepresentation, *see, e.g., Gregory v. Novak*, 121 Or App 651, 654, 855 P2d 1142 (1993), or describe the required level of specificity for pleading fraud. *See, e.g., Palmberg v. City of Astoria*, 112 Or 353, 369-70, 228 P 107, 229 P 380 (1924). As we discuss below, a defendant may be liable for fraud for a misrepresentation that creates a false impression even though it is impossible to identify the specific misrepresentation on which a person relied.

Defendant's argument goes to the heart of plaintiff's theory of fraud. In contrast to most fraud cases, plaintiff does not rely on one or a few fraudulent statements made to one or a few identifiable individuals. Rather, her theory is that defendant, in concert with other tobacco companies, engaged in a decades-long public-relations effort to create the impression in the public that there was a legitimate controversy about the health effects of smoking, even though defendant knew that such an impression was false. According to plaintiff's evidence, defendant sought to create enough doubt about the connection between smoking and disease that potential and actual smokers would have something to which they could point to justify beginning or continuing to smoke. In order to evaluate that theory, we first discuss the facts and legal authorities that support it, again stating the evidence in

the light most favorable to plaintiff, as required by our standard of review.

The first significant publicity about the effects of cigarette smoking on health came in the early 1950s, based on studies that showed that cigarette tar could cause cancer in mice and that established statistical correlations between smoking and lung cancer. Apparently as a result, total cigarette sales fell in 1953 for the first time in the twentieth century. In response to the publicity and falling sales, defendant, in cooperation with other tobacco companies, began a concerted campaign to undercut the impact on smokers and potential smokers of concerns about the consequences of smoking. The theme of the industry's publicity campaign, which continued into the 1990s, was that the effect of cigarette smoking on health was unclear and that more research was needed before a definitive answer would be possible. As plaintiff explains in her reply brief:

> "Defendant understood that it could never prove [that] cigarettes [are] safe; it was enough, however, to make it appear that there was a legitimate controversy over the link between cigarettes and lung cancer so as to give smokers like Jesse Williams something to tell themselves while they continued smoking. The message [that] defendant communicated to Jesse Williams to create the necessary uncertainty was the message that there was doubt about the causal link between cigarette smoking and human disease."

According to plaintiff, defendant communicated this message to Williams and to smokers and nonsmokers throughout Oregon and the rest of the United States over several decades. What makes the message fraudulent, in plaintiff's view, is that defendant knew that there was no legitimate controversy about the health effects of smoking and that defendant itself had no doubt that cigarette smoking carried serious health risks, including the risk of lung cancer.

Defendant attacks both the legal and factual bases for plaintiff's theory, asserting that there "is not a shred of evidence that Williams ever saw or heard a false or misleading statement made by or attributable to Phillip Morris." Defendant emphasizes plaintiff's concession that she cannot

point to a specific misrepresentation that Williams received. Rather, according to defendant, plaintiff is trying to recover for what plaintiff described to the trial court as a "fraud on the American public." Based on that understanding, defendant treats plaintiff's theory as a variation of the securities law concept of "fraud on the market." Under that concept, a purchaser or seller of stock may recover against a party whose fraudulent statements affected the market in which the plaintiff bought or sold, even if the plaintiff never personally received or otherwise knew of the misrepresentations. *See Basic Inc. v. Levinson*, 485 US 224, 248 and n 27, 108 S Ct 978, 99 L Ed 2d 194 (1988). Defendant then describes its reasons for believing that that theory, to the degree that it is valid in the securities context, does not apply to this case.

■■ ■■ We disagree with defendant's effort to characterize plaintiff's theory.[7] Rather, plaintiff's theory fits comfortably within traditional common-law principles.[8] Liability for fraud is not limited to those who deal directly with the injured party. Rather, a person who makes a misrepresentation may be liable to the intended recipients of a misrepresentation without regard to whether the person making the representation intends to defraud a particular person. As the Supreme Court said over 75 years ago, quoting a legal encyclopædia, it is a general rule of law in this country that:

> " 'Where misrepresentations are made to the public at large, or to a particular class of persons, with the intention of influencing any member of the public, or of the class, to whom they may be communicated, any one injured through proper reliance thereon may secure redress. In such a case it is not necessary that there should be an intent to defraud any particular person; but the representation must of

---

[7] Plaintiff's statements to the trial court on which defendant relies in support of its characterization were made in the context of her explanation that "there were so many misrepresentations, so many attempts to create false impression, * * * plaintiff cannot now point to one[.]"

[8] In its verdict, the jury answered "yes" to the following question:

"Did defendant make false representations concerning the causal link between smoking and cancer upon which Jesse Williams relied, and if so, were such false representations and reliance a cause of damage to plaintiff, as to cigarettes sold to Jesse Williams on or after September 1, 1988?"

The issue that the jury decided, thus, was based on traditional fraud concepts, not on the theory that defendant claims was the basis of plaintiff's case at trial.

course have been intended for the public, or for a particular class of persons to which the complainant belonged.'" *Coughlin v. State Bank of Portland*, 117 Or 83, 96, 243 P 78 (1926), *quoting* 26 CJ 1121-23, § 48bb.

In *Coughlin*, the plaintiff alleged that the defendants published misleading statements of a bank's financial condition and that the plaintiff relied on those statements in deciding to purchase stock in the bank. The Supreme Court held that the plaintiff's complaint stated a claim for fraud and entitled him to present his supporting evidence. *Id.* at 105.

In addition, under Oregon law, a defendant may make misrepresentations in many different ways.

"To communicate a representation it is not necessary that the party should speak words, or write a message. The desired result may be accomplished ofttimes by conduct. Indeed, the tongue and the pen are only two of the numerous means of transmitting messages. * * * Indeed, the action for deceit * * * had its origins in false impersonation." *Pennebaker v. Kimble et al.*, 126 Or 317, 322-23, 269 P 981 (1928).

As examples of conduct that communicates representations, the *Pennebaker* court mentioned a buoy in a harbor warning of a shoal, a check drawn on a bank implying an amount on deposit to cover it, and Paul Revere's lanterns. It then quoted a New Jersey case, which itself quoted an encyclopædia, that held that a misrepresentation

" ' "may consist in the creation of a false impression by words or acts, or by any trick or device, a deep laid scheme of swindling, or a direct falsehood, a combined effort of a number of associates or the sole effort of a solitary individual." ' " *Id.* at 323-24, *quoting Berkowitz v. Lyons*, 98 NJL 198, 119 A 20, 21-22 (1920), *quoting* 12 RCL 232.

Thus, under Oregon law, plaintiff does not need to prove that defendant expressly directed its misrepresentations to Williams or even knew of his existence, so long as plaintiff can show that Williams was within a class of people whom defendant intended to be recipients of and to rely on the message that it conveyed. In addition, the fundamental character of fraud is the communication of a misimpression to induce another to rely on it. That is something that a

defendant may do by a variety of actions as well as by specific statements. Plaintiff alleges that the message that defendant intended to convey was that there was a legitimate controversy about whether there was a connection between cigarette smoking and human health and that it intended to encourage smokers to continue to smoke and not to make the necessary effort to stop smoking. As a smoker, Williams was an intended recipient of defendant's message.

The evidence would permit the jury to find that defendant conveyed the message that plaintiff describes over many years and in many ways, intentionally creating an impression on which it intended Williams and other smokers to rely. The length of the time over which defendant conveyed the message, and the nature of the misrepresentations on which Williams relied, make it unlikely that plaintiff could single out a specific instance from all of the representations that Williams received. Defendant's purpose was to create an impression in the public's mind—including smokers like Williams—that the health issue remained undecided.[9] In late 1953, after the early studies linking cigarette smoking with cancer and the apparently connected fall in cigarette sales, a number of tobacco companies, including defendant,[10] joined to hire a leading public relations firm to find a way to counter their effect. The first step in their subsequent campaign was the publication in January 1954 of "A Frank Statement to Cigarette Smokers."[11] Defendant and the other leading tobacco companies, together with several associations of

---

[9] Plaintiff also presented evidence showing that advertising for Marlboros emphasized images of healthy and strong men. The apparent purpose of that evidence was to show that the advertising created an impression that contradicted the idea that smoking could cause disease. Because there is sufficient evidence of direct representations to support the jury's verdict, we do not need to consider whether defendant's advertising strategy would also be relevant for that purpose.

[10] At the time, defendant was the fifth largest tobacco company in the country. In large part due to the success of Marlboros, its market share grew over the following years until it reached its current status of having approximately half of the domestic market for cigarettes.

[11] The trial court ruled that there was no evidence that Williams relied on the "Frank Statement," and plaintiff does not challenge that ruling on appeal. The "Frank Statement" remains relevant, however, as evidence of the beginning of a campaign on which, the jury could have found, Williams did rely. The court instructed the jury that it could consider the "Frank Statement" as relevant to defendant's knowledge or state of mind.

tobacco growers and marketers, signed the statement, which appeared in 448 newspapers. The publicity covered the great majority of the country's population. In the "Frank Statement," the signatories stated that they believed that their products were not injurious to health and announced the establishment of the Tobacco Industry Research Committee (TIRC) to conduct research into "all phases of tobacco use and health." In 1964, the TIRC was divided into the Tobacco Institute, which focused on public relations and lobbying, and the Council on Tobacco Research (CTR), which supported scientific research.

According to plaintiff's evidence, the "Frank Statement" was the beginning of a "common front" approach among tobacco companies on the health issue, with all companies expressing essentially the same message and using the TIRC and its successors to speak for the industry as a whole. Their original position was to deny that there was a problem; thus in the 1950s and early 1960s Phillip Morris officials represented publicly that the company would "stop business tomorrow" if it thought that its products were harmful. However, as evidence of the harmful effects of tobacco increased,[12] the industry took a different approach. Particularly after the 1964 Surgeon General's report, which emphasized the connection between smoking and lung cancer, the industry focused on keeping the "controversy" alive and calling for "more research" for the purpose of suggesting that the health question about cigarette smoking was not yet clear. In an internal memorandum shortly after the 1964 report, a Phillip Morris vice president explained that it was necessary to "provide some answers which will give smokers a psychological crutch and a self-rationale to continue smoking." From the evidence in this case, the jury could properly infer that Williams was one of those smokers to whom defendant was referring.

Defendant and the industry continued throughout the 1970s, 1980s, and 1990s to encourage the impression that there was a genuine and continuing controversy. They did

---

[12] One of plaintiff's expert witnesses testified that, by the late 1950s, there could no longer be a genuine scientific question about the connection between smoking and lung cancer.

not expressly deny that cigarettes caused cancer but instead provided smokers what a Tobacco Institute memorandum described as "ready-made credible alternatives" to that conclusion by suggesting that there were other factors involved in the diseases of which smokers died and by emphasizing that there was "no proof that smoking causes cancer." The jury in this case could find from the evidence that, in making those statements, they relied on criteria for proof of causation that the scientific community generally either had never accepted or had since discarded. Although defendant and the industry[13] emphasized the need for research, and although it is inferable from the evidence that defendant and other tobacco companies conducted a great deal of research into tobacco themselves and sponsored other researchers, they consciously avoided research in the United States that might indicate the biological effects of tobacco use and thus resolve the question that, they claimed, most needed further research. In particular, defendant conducted all sensitive research in a laboratory that it purchased in Europe, taking care to avoid preserving records of the results in this country. The person who was defendant's director of research in the late 1970s and 1980s told a subordinate that one of the director's functions was to "fuel the controversy" as to whether cigarettes cause disease. The director explained that it was his job

> "to attack outside reports of links between smoking and cancer or smoking and emphysema or things of that sort by maintaining that there's a controversy and providing the information that would discredit or somehow cast [doubt] on the outside research."

Defendant and the tobacco industry promoted their message through a large number of press releases and statements and through less obvious methods, including influencing the content of apparently neutral articles and cultivating "opinion leaders" who would convey their message. They attempted to use the power of their advertising to procure

---

[13] The Tobacco Institute, rather than defendant itself, made many of the statements on which plaintiff relies. The jury could find that in making those statements the Tobacco Institute acted on behalf of defendant and other cigarette manufacturers.

favorable treatment from the print media. Industry spokespersons appeared on news shows on commercial and public television to state their position on smoking and health issues. The theme of their statements was that the evidence concerning the health effects of tobacco was based primarily on statistical relationships and that there was no proof that a specific tobacco component caused a specific disease. In addition, they suggested that there could be other causes, not connected to tobacco use, for the various diseases attributed to smoking. Although by the early 1990s the industry was forced to agree that tobacco could be a risk factor associated with a number of diseases, its spokesmen still publicly asserted that there was a long chain of intervening events involved before a disease arose from cigarette smoking. Defendant also stated publicly that it did not believe that cigarette smoking was addictive.

There is evidence that Williams received the message that defendant intended to communicate and that the message affected his decision to continue smoking and not to make more serious efforts to overcome his addiction to cigarettes.[14] Williams read the *Oregonian*, other newspapers and magazines, and watched television, all of which were media through which defendant conveyed its message. The evidence includes examples of newspaper stories describing the · dangers of tobacco that also contain statements from industry spokespersons insisting that the dangers were not proved and at times attacking the validity of the research suggesting harmful effects. Industry newspaper advertisements conveyed the same message. For instance, in an article published in the *Oregonian* in 1991, an industry spokesman said that the dangers were not proven and argued that the money that the CTR spent on research showed how open-minded the industry was.

---

[14] Defendant points to the large amount of information available to Williams that emphasized the dangers of smoking to health. Plaintiff does not disagree with that point. Rather, her argument is that defendant created a controversy in order to give smokers like Williams a reason to continue smoking despite the information concerning the dangers. Plaintiff makes the argument, which the jury was entitled to believe from the evidence, that defendant knew that smoking was harmful to health but instead misrepresented that fact to the public, through the information it disseminated for its own economic gain.

Williams' own statements show that he received and relied on defendant's misrepresentations. When Williams' family urged him to stop smoking, he responded that what he had seen on television demonstrated that smoking did not cause cancer. When his son gave him articles on the subject, he responded by finding his own articles that countered the dangers of smoking. After his diagnosis, he told his wife that the "cigarette people" had deceived him, that he had been betrayed, and that "they were lying all of the time." The jury could find from the evidence that no one other than defendant and the rest of the tobacco industry promoted the message to which Williams referred. Because of his exclusive use of Phillip Morris products, the jury could also conclude that he meant defendant when he referred to the "cigarette people."[15] Thus, the evidence supports a reasonable inference that Williams purchased cigarettes after September 1, 1988, in reliance on defendant's previous and continuing representations and that those cigarettes were a substantial factor in causing his lung cancer. Consequently, the trial court did not err in denying the motion for a directed verdict on the fraud claim.

Defendant raises no issues concerning the amount of compensatory damages awarded to plaintiff on the fraud claim. Because the award of compensatory damages on the fraud claim is greater than the award of compensatory damages on the negligence claim due to the effect of the comparative negligence verdict, we need not consider defendant's assignments of error concerning the negligence claim. The trial court properly entered judgment for plaintiff for compensatory damages on the fraud claim.

■■ We turn to the issue of punitive damages. We first consider the requirements for an award of punitive damages and the standard by which we review a jury's decision to make such an award. ORS 18.537(1) and ORS 30.925(2)

---

[15] Defendant argues that the only message that it is certain that Williams received was the health warning on each pack of cigarettes. There is evidence that Williams handled the packs in such a way that he seldom saw the warning. More significantly, when his wife drew his attention to the warning, Williams responded, "This is what the Surgeon General says, it's not what [the] tobacco company says." The existence of the warning was only one factor for the jury to consider in determining whether Williams reasonably relied on defendant's representations.

establish the criteria for the jury to apply in deciding whether to award punitive damages and in determining their amount. ORS 18.537(1) provides that, in order to recover punitive damages, the plaintiff must prove by clear and convincing evidence

"that the party against whom punitive damages are sought has acted with malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety and welfare of others."

ORS 30.925(2) establishes more specific criteria for awarding punitive damages in a product liability civil action:

"Punitive damages, if any, shall be determined and awarded based upon the following criteria:

"(a) The likelihood at the time that serious harm would arise from the defendant's misconduct;

"(b) The degree of the defendant's awareness of that likelihood;

"(c) The profitability of the defendant's misconduct;

"(d) The duration of the misconduct and any concealment of it;

"(e) The attitude and conduct of the defendant upon discovery of the misconduct;

"(f) The financial condition of the defendant; and

"(g) The total deterrent effect of other punishment imposed upon the defendant as a result of the misconduct, including, but not limited to, punitive damage awards to persons in situations similar to the claimant's and the severity of criminal penalties to which the defendant has been or may be subjected."

If a jury awards punitive damages, both the trial and appellate courts review the amount of the award to determine whether it meets the statutory and constitutional standards. The legislature has codified the Supreme Court's statement of the nature of that review:

"If an award of punitive damages is made by a jury, the court shall review the award to determine whether the award is within the range of damages that a rational juror

would be entitled to award based on the record as a whole, viewing the statutory and common-law factors that allow an award of punitive damages for the specific type of claim at issue in the proceeding." ORS 18.537(2); *see Parrott v. Carr Chevrolet, Inc.*, 331 Or 537, 551 n 10, 17 P3d 473 (2001) (stating that ORS 18.537(2) codifies the standard established in *Oberg v. Honda Motor Co.*, 320 Or 544, 888 P2d 8, *cert den* 517 US 1219 (1996)).

The heart of the standard for reviewing awards of punitive damages, thus, is determining whether the award is one that a rational juror could make in light of the record as a whole and the legal factors that justify an award of punitive damages on the specific type of claim. In *Parrott*, the Oregon Supreme Court recently held that the rational juror standard is consistent with the federal Due Process standard discussed in *BMW of North America, Inc. v. Gore*, 517 US 559, 116 S Ct 1589, 134 L Ed 2d 809 (1996). The Court said that the *Gore* guideposts, together with the Oregon statutory standard, establish five criteria that a court should consider in determining the range that a rational juror would be entitled to award:[16]

"(1) the statutory and common-law factors that allow an award of punitive damages for the specific kind of claim at issue * * *; (2) the state interests that a punitive damages award is designed to serve * * *; (3) the degree of reprehensibility of the defendant's conduct * * *; (4) the disparity between the punitive damages award and the actual or potential harm inflicted * * *; and (5) the civil and criminal sanctions provided for comparable misconduct[.]" *Parrott*, 331 Or at 555.

Defendant argues that *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 US 424, 121 S Ct 1678, 149 L Ed 2d 674 (2001), undercuts the continuing vitality of *Parrott*. In *Cooper Industries*, the United States Supreme Court held that an appellate court must review a trial court's

---

[16] The trial court held that the jury's award of punitive damages was proper under the Oregon statute, but it reduced the award on the ground that it was excessive under the federal constitution. It reached that conclusion before the decision in *Parrott* and thus did not have the benefit of the Supreme Court's analysis in that case.

decision on whether an award of punitive damages is excessive as a matter of law rather than for an abuse of discretion.[17] In reaching that conclusion, the Court stated that the amount of a punitive damages award is not a finding of fact that implicates the Seventh Amendment's limitations on judicial review of jury awards. Defendant argues that that holding in *Cooper Industries* weakens the premise of *Parrott*, which defendant identifies as treating the review of a punitive damages award as the review of a factual determination by a jury. Rather, according to defendant, it is now clear that the imposition of punitive damages is not based on findings of fact but on the application of a constitutional standard to the facts of a case. Thus, according to defendant, the rational juror standard of *Parrott* does not satisfy constitutional requirements.

We disagree with defendant's understanding of *Cooper Industries.* The background for that case was the Court's long-established rule that the Seventh Amendment forbids appellate review of federal district court refusals to set aside jury awards of compensatory damages on the ground that they are excessive. The Court modified that rule several years before *Cooper Industries* to allow federal appellate courts to review district court determinations for abuse of discretion, at least in diversity cases when the substantive state law provided for that kind of appellate review. *Gasperini v. Center for Humanities, Inc.*, 518 US 415, 116 S Ct 2211, 135 L Ed 2d 659 (1996).

In *Cooper Industries* the Court held that a jury's determination of the *amount* of punitive damages was not a "fact" within the *Gasperini* rule and thus was subject to a broader scope of appellate review than it had established in that case. *See* 532 US at 437-40 and n 11. However, it also recognized that determining the amount of punitive damages is a "fact-sensitive undertaking" that is appropriately left to the discretion of the jury. *Id.* at 437-38 n 11. The Court noted

---

[17] The phrase that the *Cooper Industries* Court used was "*de novo*" review. As we have previously noted in discussing *Cooper Industries,* that is not a phrase that Oregon courts apply to the review of legal holdings; it is properly limited to the review of factual findings. *See Bocci v. Key Pharmaceuticals, Inc.*, 178 Or App 42, 50 n 2, 35 P3d 1106 (2001), *rev den* 334 Or 260; *Waddill v. Anchor Hocking, Inc.*, 175 Or App 294, 302 n 5, 27 P3d 1092 (2001), *rev den* 334 Or 260 (2002).

in *Cooper Industries* that the district court had instructed the jury concerning the factors for it to consider in awarding punitive damages. It then stated that, "[a]lthough the jury's application of these instructions may have depended on specific findings of fact, nothing in our decision today suggests that the Seventh Amendment would permit a court, in reviewing a punitive damages award, to disregard such jury findings." *Id.* at 439 n 12. Finally, the Court reaffirmed that the *Gore* criteria are the appropriate criteria for reviewing an award of punitive damages for excessiveness. *Id.* at 440.

The Court in *Cooper Industries*, thus, recognized the jury's primary role in finding the facts relevant to an award of punitive damages, in determining whether to make such an award, and in establishing the appropriate amount. *Cooper Industries*, in our view, does not alter the criteria by which a trial court is to review that award and, thus, does not affect the Oregon Supreme Court's discussion of those criteria in *Parrott*. Rather, what *Cooper Industries* does is to require an appellate court to review the trial court's decision on the amount of punitive damages as a matter of law—that is, by plenary review—rather than for an abuse of discretion. *See also Bocci v. Key Pharmaceuticals, Inc.*, 178 Or App 42, 50-51, 35 P3d 1106 (2001), *rev den* 334 Or 260 (2002). That is consistent with the way that we have always reviewed trial court decisions regarding punitive damages. *See, e.g., MacCrone v. Edwards Center, Inc.*, 160 Or App 91, 106, 980 P2d 1156 (1999), *vac'd and rem'd* 332 Or 41, 22 P3d 758, *adh'd to on remand* 176 Or App 355, 31 P3d 513 (2001), *rev den* 334 Or 190 (2002); *Blume v. Fred Meyer, Inc.*, 155 Or App 102, 114, 963 P2d 700 (1998). We therefore follow the *Parrott* criteria, including the reasonable juror standard, in reviewing the jury's award against defendant, and we give no deference to the trial court's decision on the issue.

We first consider defendant's two assignments of error concerning the jury instructions on punitive damages. Defendant assigns error to the trial court's failure to instruct the jury that its award should bear a reasonable relationship to the harm caused to Williams. However, the proposed instruction would also have told the jury not to punish defendant for alleged misconduct towards other persons who might bring their own cases and receive their own punitive

damages awards. In *Parrott*, the Supreme Court made it clear that the potential injury to past, present, and future consumers as the result of a routine business practice is an appropriate consideration in determining the amount of punitive damages. 331 Or at 563. The proposed instruction's speculative reference to unknown other lawsuits by unknown other plaintiffs was contrary to that principle. It was also inconsistent with ORS 30.925(2)(g), which allows the jury to consider other punishments already imposed on the defendant. Because the proposed instruction was incorrect in that respect, we do not need to consider whether the rest of it was correct. The trial court properly rejected it. *See Simpson v. Sisters of Charity*, 284 Or 547, 560, 588 P2d 4 (1978) (trial court not required to give instruction that contains, in part, erroneous language).

■ Defendant also assigns error to the trial court's instruction that the maximum amount that the jury could award was $100 million. It argues that that instruction told the jury that it could award an amount that would have been far greater than what was constitutionally permissible. Plaintiff's complaint prayed for $100 million in punitive damages. The trial court in its instruction merely told the jury what plaintiff sought. Defendant did not move to reduce the amount of the prayer on the ground that it was greater than the evidence would support or that it sought an impermissible amount. In addition, telling the jury the upper limit that the pleadings establish for its verdict is consistent with ordinary Oregon trial practice. *See Wiebe v. Seely, Administrator*, 215 Or 331, 357, 335 P2d 379 (1959).

■ We now evaluate the jury's award for excessiveness under the previously stated criteria. We begin by stating the relevant evidence that we have not previously described, again stating it in the light most favorable to plaintiff. *Parrott*, 331 Or at 556. In addition to the evidence that defendant intentionally made false representations to Williams and that he relied on them to his detriment, plaintiff points to five categories of evidence to support the jury's award of punitive damages in the amount of $79.5 million.[18] First, there is

---

[18] Defendant asserts that, because the jury declined to award punitive damages on the negligence claim, it could consider only evidence relevant to the fraud

evidence that defendant knew that smoking caused lung cancer and other diseases at the same time that it publicly claimed that the issue was unresolved. As early as 1958, three British scientists, meeting with scientists and tobacco executives, reported that industry representatives believed that smoking could lead to lung cancer. In 1961, defendant's director of research stated internally that "carcinogens are found in practically every class of compounds in smoke" and that the best that the company could hope to do was to reduce their amounts. Later, defendant's internal memoranda made similar points, in some instances suggesting that the company could not admit the facts publicly because of the probable adverse legal consequences.

Second, defendant recognized that nicotine was both addictive and the primary reason why people continued smoking. The strongest statement of this fact may have been a presentation by a Phillip Morris scientist in 1972. In that presentation, he stated that the "cigarette should be conceived not as a product but as a package. The product is nicotine[.]" He continued, "[t]hink of the cigarette pack as a storage container for a day's supply of nicotine," and "[t]hink of the cigarette as a dispenser for a dose of nicotine." Defendant spent considerable effort in the following years studying the best way to deliver the optimal dose of nicotine in each cigarette and to increase the effectiveness of the nicotine, resulting in the discovery of a number of ways of manipulating the material in cigarettes for that purpose without actually adding nicotine to it.

Also, defendant carefully evaluated smoking cessation programs and technologies, concluding that alternative sources of nicotine, such as patches or gum, were ineffective in the absence of ongoing behavioral therapy. Because that therapy was expensive and time consuming, defendant thought it unlikely that it would have a serious effect on the number of smokers. Defendant's public relations program of creating a controversy that would give smokers a "crutch," a

---

claim in determining whether to award punitive damages and in determining their amount. The evidence that defendant seeks to exclude from our review of the jury's decision relates to the consequences of defendant's fraudulent conduct, which is certainly relevant to an award of punitive damages. The evidence was admitted without limitation, and the jury was entitled to consider it.

reason to believe that there were serious doubts that tobacco was harmful, thus, would discourage them from making the significant effort that was necessary to stop smoking. The "controversy" created by the tobacco industry was defendant's method of counteracting the information that otherwise suggested the harmfulness of cigarettes. Such an approach was aimed particularly at highly addicted smokers like Williams, who would search for any justification to continue smoking.

Third, defendant conducted research in such a way as to avoid studying the health effects of smoking, all the while asserting publicly that there was need for further research on that very issue. It used the CTR's research as a shield and as a source for expert witnesses at congressional hearings and in lawsuits against it rather than for research into the relationship between smoking and disease. The jury could have found on the record in this case that defendant specifically avoided testing with live animals and testing actual production cigarettes. On one occasion when defendant did test production cigarettes, the results were unfavorable, and it destroyed them. It is inferable from the record that tobacco industry lawyers, rather than scientists, set the general direction of the CTR's research program and that they did so for the purpose of protecting the industry's litigation position rather than to resolve scientific questions.

Also, the jury could have found that the tobacco industry had a "gentleman's agreement" not to conduct research beyond the scope of the CTR's efforts. Thus, to the degree that defendant conducted animal testing that was relevant to the relationship between cigarette smoking and human disease, it did so in a European laboratory and took precautions to ensure that the results of that research did not appear in its American records.

Fourth, defendant's actions caused harm to many others in Oregon besides Williams. Although a tobacco industry survey indicated that 85 percent of smokers wished that they had never started smoking, defendant concealed information that the addictive effects of nicotine made it difficult for them to stop without significant assistance. The fraudulent statements from defendant and the rest of the industry

reinforced those addictive effects by giving smokers a reason not to make the necessary effort to break the addiction. The jury could find on this record that defendant's public relations campaign had precisely the effect that defendant intended it to have and that it affected large numbers of tobacco consumers in Oregon other than Williams. It is also reasonably inferable from the evidence that defendant's products, used as defendant intended them to be used, caused a significant number of deaths each year in Oregon during the pertinent time period, together with other serious but nonfatal health problems with their attendant economic consequences.

Finally, cigarettes are relatively inexpensive to produce, and they provide a large profit margin. By maintaining a large population of smokers through fraudulent representations, defendant protected those profits. At the time of trial, defendant's net worth was over $17 billion. Its profit from cigarette sales in 1996, the year that Williams was diagnosed with lung cancer, was over $2 billion. In 1997, the year that Williams died and the most recent year for which figures were available at the time of trial, defendant's profit was $1.6 billion.

In light of the above evidence, we turn to the applicable criteria for an award of punitive damages.[19] First, the jury could find that there was a strong likelihood at the time of defendant's fraudulent statements that serious harm would arise from them. ORS 30.925(2)(a). Even at the beginning of defendant's public relations scheme, it was generally recognized that cigarette smoking had probable serious health consequences. Viewing the evidence most favorably to plaintiff, there was little doubt about the relationship between smoking and lung cancer by the late 1950s, and there was absolutely no basis for a genuine dispute on the

---

[19] The legislature first adopted those criteria for awarding punitive damages in 1979, Or Laws 1979, ch 866, § 3, although at least some of them reflect previous case law. Defendant thus was on notice of the possibility of a punitive damages award under Oregon law for its conduct 17 years before Williams was diagnosed with lung cancer and 9 years before September 1, 1988, the beginning of the period during which plaintiff had to prove that cigarette smoking was a substantial factor in causing Williams' death.

issue by the 1970s and 1980s. Throughout that period, defendant continued its public relations campaign asserting that smoking had not been proven to be harmful and that more research was necessary. Its campaign was intended to give smokers a crutch to justify their continued smoking, and the jury could reasonably conclude that the message that defendant disseminated would put all of those who relied on it at risk and would cause serious harm to many of them.

Second, the jury could find that, by 1958, defendant was aware of the likelihood of the harm that its actions would cause and that it was certainly aware of that harm by the 1970s. ORS 30.925(2)(b). Third, defendant's misconduct was highly profitable, producing billions of dollars of profit over many years. There is evidence that defendant believed, in fact, that its misrepresentation of the dangers of smoking was important to its ability to continue in the cigarette business. ORS 30.925(2)(c). Fourth, defendant's misconduct lasted over four decades, and defendant concealed it as long as it could. The extent of defendant's actions did not become clear until judicially required releases of documents occurred in the 1990s. ORS 30.925(2)(d). Fifth, there is no evidence that defendant showed any regret or changed its conduct upon the discovery of its actions. ORS 30.925(2)(e). Sixth, defendant is a wealthy corporation, and a small award of punitive damages would have little effect on it. ORS 30.925(2)(f). Finally, there is no evidence in the record of other punishment (including other punitive damages awards) inflicted upon defendant as a result of its misconduct. ORS 30.925(2)(g).

 We turn next to the criteria that the United States Supreme Court identified in *Gore* and that the Oregon Supreme Court adopted in *Parrott*. The first *Gore* criterion concerns the state interests that an award of punitive damages is designed to serve. Those interests involve the health and lives of the state's citizens and residents. It is difficult to perceive how the state could have any greater interest than the preservation of the health and the lives of the citizens who make up the state. In *Waddill v. Anchor Hocking, Inc.*, 175 Or App 294, 27 P3d 1092 (2001), *rev den* 334 Or 260 (2002), we held that there is a state interest in preventing

injury to Oregon consumers from defective products and in punishing manufacturers who fail to investigate the safety of their products. 175 Or App at 306. Here, the jury could find that defendant did not simply fail to investigate the safety of its products; it knew that they were unsafe and entered on a course of fraudulent conduct designed to encourage Oregon smokers to continue using those products despite the danger to their health.

The second *Gore* criterion concerns the reprehensibility of the defendant's actions. The jury could find from the evidence that defendant sought to make large amounts of money by engaging for more than four decades in a fraudulent scheme to induce people to use or continue to use a product that could cause serious illness or death to a significant percentage of those who used it as intended. Because defendant's product affected the lives and the health of consumers as well as the economic interests of both consumers and non-consumers, and because it occurred over an extended period, that conduct is far more reprehensible than the unlawful methods of selling used automobiles by the defendant that the *Parrott* court considered. In light of the Supreme Court's decision in that case, the comparative harm in this case strongly suggests an award of punitive damages.

The third *Gore* factor is the disparity between the punitive damages award and the actual or potential harm inflicted. Defendant argues that the primary issue in evaluating this factor is the ratio between plaintiff's compensatory damages and the punitive damages award. It notes that the jury's verdict would produce a ratio of 97 to 1, while the ratio after the court's remittitur is 39 to 1. It discusses a number of other cases in which the ratios between the plaintiff's injuries and the punitive damages award were considerably less and refers to several United States Supreme Court cases that appeared to give the ratio significant weight in determining whether an award was excessive. The difficulty with this approach is that, as the Oregon Supreme Court pointed out in *Parrott*, the federal court's treatment of the subject demonstrates that "no 'simple mathematical formula' controls our review of the ratio of punitive damages to actual and potential harm." 331 Or at 563. That is not surprising,

because it is inherently impossible to capture all of the qualitative factors that go into determining the appropriate level of punishment in one simple ratio.

In *Parrott*, the Supreme Court affirmed a verdict in a case of consumer fraud in which the ratio between punitive and compensatory damages was 87 to 1. In doing so, it explained:

> "Because defendant's tortious conduct was a routine part of its business practice that it was unwilling to change, we also consider the potential injury that its misconduct may have caused to past, present, and future customers. Additionally, although the actual economic harm that plaintiff suffered in this proceeding was relatively small, that harm was the result of defendant's 'particularly egregious' acts." 331 Or at 563.

In this case, defendant's actions were part of its business strategy for over 40 years and, in defendant's own assessment, significantly contributed to its profitability. It is thus appropriate to consider the effects of defendant's actions on persons other than Williams in determining the amount of punitive damages. As we have already discussed, defendant's actions, even more than those of the defendant in *Parrott*, were "particularly egregious" and thus justify particularly strong judicial punishment. *See Lane County v. Wood*, 298 Or 191, 203, 691 P2d 473 (1984) (purpose of punitive damages is "not to compensate an injured party, but to give bad actors a legal spanking"). In light of the 87 to 1 ratio in *Parrott*, we see nothing in a ratio of 97 to 1 that raises our judicial eyebrows, given the egregious nature of defendant's conduct as implicitly determined by the jury.

Beyond that, defendant's narrow focus on the ratio between punitive and compensatory damages ignores the underlying purpose for awarding punitive damages, which is to punish and deter a wrongdoer. The reprehensibility of the defendant's actions, the number of people affected or potentially affected, and indications that the defendant will not change its actions without punishment are all relevant factors. It is also clear that the defendant's wealth is an important consideration; an award that might be a serious punishment for one defendant could be only a minor inconvenience

for another. *See Hicks v. Lilly Enterprises,* 45 Or App 211, 217, 608 P2d 186 (1980). Oregon law has recognized that principle for over 60 years. *See State ex rel Thesman v. Dooley,* 270 Or 37, 42, 526 P2d 563 (1974); *Lamb v. Woodry,* 154 Or 30, 47, 58 P2d 1257 (1936); *see also Restatement (Second) of Torts,* § 908 and comment e (1979). In this case, defendant's net worth is over $17 billion, and its profits for the year closest to the trial were over $1.6 billion, or approximately $30.7 million per week. The jury's award of $79.5 million, thus, is equal to a little more than two and a half weeks' profit.

Thus, there are at least two factors for determining the disparity between the punitive damages award and the actual harm inflicted in addition to the ratio to which defendant gives so much attention. First, when the defendant's conduct involves a course of conduct that has affected people other than the plaintiff, the jury may properly consider the effect of that conduct on those other people. Although defendant is legitimately concerned that there may be future punitive damages awards that, combined with the one in this case, would be excessive in total, ORS 30.925(2)(g) provides the appropriate method of avoiding that result. By requiring the jury and court to consider the total deterrent effect of other punishment imposed on defendant, including other punitive damages awards, it will permit future juries and courts to take previous awards into account when they set or evaluate punitive damage awards in future cases. The alternative to that approach is to limit punitive damages in this case to an amount that may be inadequate, based on speculation of what might happen in some unknown future case.

The second additional factor is that there is more to the issue of proportionality than the dollar amounts involved. First, when the record contains evidence of the defendant's financial condition, determining the proper relationship between the punitive award and the actual harm may well include consideration of that evidence. The same dollar amount will have a very different effect, for example, on a small, struggling business from what it will have on a large, profitable one. Second, some kinds of harm cannot be fully captured in money value. In this case, for example, the jury could have found that defendant's actions resulted in

72

Williams' death; based on that finding, it could have believed, in light of defendant's profits, that only a large award would be proportionate to the harm that defendant caused.[20]

 The final *Gore* criterion concerns the civil and criminal penalties that could be imposed for comparable misconduct. The court in *Parrott* appears to have treated this factor as primarily related to fair notice to the defendant of the extent of punishment that the state might impose for its actions. 331 Or at 563-64. Oregon law does not provide administrative or other civil sanctions for defendant's actions. Plaintiff argues, however, that first-degree manslaughter, ORS 163.118(1)(a), and second-degree manslaughter, ORS 163.125(1)(a), which impose penalties for reckless homicide, are relevant to this factor. The problem, as defendant points out, is that it is difficult to compare the criminal sentences available under the manslaughter statutes with the economic sanction of punitive damages, particularly when the defendant is a corporation. We do not believe that this factor plays a major role one way or the other. To the extent that the issue involves adequate notice to defendant, the established Oregon law of punitive damages, including ORS 30.925(2), was sufficient to alert defendant to the possible punishment for its fraudulent scheme. After consideration of all of the above factors, we conclude that the jury's award was not excessive under the criteria identified in *Parrott* and *Gore*, and the trial court therefore erred in reducing it.

 Finally, defendant argues that the trial court erred in refusing to exercise its discretion under ORS 18.537(3) to reduce the jury's award to reflect a settlement that it and other cigarette manufacturers had reached with 46 states. That statute authorizes a court to reduce an award if the

[20] Defendant also suggests that it is being punished for its participation in a public debate concerning a matter of general importance and that that punishment violates Article I, section 8, of the Oregon Constitution. Defendant ignores that the jury could have found that, rather than engaging in a public debate, defendant made representations concerning the relationship between smoking and human health either without believing them to be true or in reckless disregard of their truth or falsity and that it did so to induce people like Williams to continue using its products. That kind of fraud is not something that the Oregon Constitution protects. *See Smallwood v. Fisk*, 146 Or App 695, 934 P2d 557 (1997) (punitive damages for fraud are a historical exception to Article I, section 8).

defendant establishes that it has taken reasonable remedial measures to prevent recurrence of the conduct that gave rise to the punitive damages award. Defendant argues that the settlement with the state qualifies under the statutory criteria. The trial court denied the motion on the ground that the settlement did not constitute an unequivocal acceptance of responsibility, which it believed was necessary to meet the criteria for a reduction in the jury's award under the statute. Plaintiff also argues that, to the extent that the statute permits a court to reduce a jury's award based on evidence that was not before the jury, the statute violates Article VII (Amended), section 3, of the Oregon Constitution.

We do not need to decide whether either defendant or plaintiff correctly understands the import of the statute. The factual foundation of defendant's argument is the Consent Decree and Final Judgment[21] that resolved the litigation between defendant and the State of Oregon. Section VI(G) of that judgment provides, in part:

> *"Neither this Consent Decree and Final Judgment nor any public discussions, public statements or public comments* with respect to this Consent Decree and Final Judgment by the State of Oregon or any Participating Manufacturer or its agents *shall be offered or received in evidence in any action or proceeding for any purpose* other than in an action or proceeding arising under or relating to this Consent Decree and Final Judgment." (Emphasis added.)

The trial court could not use the settlement as a basis for reducing the jury's verdict without the consent judgment somehow being in evidence. By its own terms, which reflect defendant's agreement with the state and the other parties to the litigation that led to the judgment, the settlement was not admissible for the purpose for which defendant seeks to use it in this case. The trial court did not err.

---

[21] Despite its caption, the document at issue is simply a judgment. Since the effective date of the Oregon Rules of Civil Procedure, "judgment" has been the sole correct term for the final determination of the rights of the parties in a civil action. "Decree," which formerly referred to the final determination of the rights of the parties in a suit in equity, is no longer appropriate. *See* ORCP 2; ORCP 67 A; *Webber v. Olsen*, 330 Or 189, 192 n 1, 998 P2d 666 (2000).

We do not discuss the remaining arguments of the parties because there would be no benefit to the bench or bar from our doing so.

On appeal, reversed and remanded with instructions to enter judgment on jury verdict; affirmed on cross-appeal.