Argued and submitted November 8, 2019, reversed and remanded
January 27, 2021

Delmer L. JOHNSON,
*Plaintiff-Appellant,*

*v.*

Glenn KEIPER, Jr., M. D.;
Keiperspine, PC, an Oregon corporation; and
Spine Surgery Center of Eugene, LLC,
an Oregon limited liability company,
*Defendants-Respondents.*

Lane County Circuit Court
17CV08365; A167924

481 P3d 994

In this appeal of a medical malpractice action, plaintiff alleges that defendants' negligence in performing spinal-fusion surgery and providing post-surgical diagnostics and care led to "foot drop" in his left foot. Plaintiff assigns error to the trial court's (1) ruling that plaintiff's expert witness, a neurosurgeon, was not qualified to testify about defendants' post-surgical standard of care and (2) grant of defendants' directed verdict motion on the basis that plaintiff had not proven that defendants' alleged negligence caused plaintiff's condition because plaintiff's expert could not testify to the degree of harm caused by defendants' negligence. *Held*: Because plaintiff's expert witness's experience made him well situated to understand plaintiff's condition and the steps that were necessary to care for plaintiff after his surgery, he was qualified to testify about plaintiff's post-surgical care allegations. Also, the proof of the injury caused by defendants' negligence was provided with as much certainty as the circumstances permitted, and the plaintiff therefore provided proof of the injury caused by defendants' negligence with sufficient certainty for plaintiff's claim to reach the jury.

Reversed and remanded.

R. Curtis Conover, Judge.

Gary M. Bullock argued the cause for appellant. Also on the briefs was Gary M. Bullock and Associates, P.C.

Hillary A. Taylor argued the cause for respondents. Also on the brief was Keating Jones Hughes, P.C.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Aoyagi, Judge.

ARMSTRONG, P. J.

Reversed and remanded.

**ARMSTRONG, P. J.**

This is a medical malpractice action in which plaintiff alleges that defendants' negligence in performing spinal-fusion surgery and providing post-surgical diagnostics and care led to "foot drop" in his left foot, which is the loss of strength necessary to raise the foot. The trial court granted defendants a directed verdict at trial on all of plaintiff's claims, and plaintiff appeals the general judgment. In four assignments of error, plaintiff contends that the trial court erred in denying his motion to amend his complaint; in excluding testimony by two of his experts—Dr. Dietrich and Dr. Taylor—on the ground that they were not qualified to testify about defendants' post-surgical standard of care; and in granting the directed verdict. We reject without written discussion plaintiff's assignments of error concerning the motion to amend the complaint and the exclusion of Taylor's testimony. However, on the assignments of error on Dietrich's testimony and the directed verdict, we agree with plaintiff and therefore reverse and remand.

Because we are reviewing both the trial court's ruling on a directed verdict and the evidentiary question of Dietrich's qualifications to testify, we present the facts that apply to each ruling differently. On the directed verdict in favor of defendants, we present the facts in a manner that is most favorable to plaintiff, drawing all reasonable inferences in his favor from the evidence. On the evidentiary ruling, we present the record that the court had before it when making its ruling. *See Trees v. Ordonez*, 354 Or 197, 200, 311 P3d 848 (2013) (in reviewing a trial court's grant of a directed verdict in a defendant's favor, the facts are stated "in the light most favorable to plaintiff, drawing every reasonable inference from the evidence" in plaintiff's favor); *State v. Eatinger*, 298 Or App 630, 632, 448 P3d 636 (2019) ("When we review a trial court's evidentiary ruling, we do so in light of the record that was before the court at the time of the ruling.").

## I.   BACKGROUND

Plaintiff began receiving treatment in 2013 from defendants—Dr. Keiper and associated entities Keiperspine,

PC and Spine Surgery Center of Eugene, LLC—for back pain. Defendants diagnosed lumbar stenosis (a narrowing of the spine that puts pressure on nerves) of the L3-4 and L4-5 vertebrae and sciatica (compression of nerve roots causing back pain). Over time, defendants tried several treatments and surgeries for plaintiff—which included microlamino-tomies, a medial facetectomy, and foraminotomies (all of which involve removing portions of the vertebrae to relieve pressure on the spinal nerves) as well as epidural steroid injections—but they were not successful in resolving plain-tiff's pain. In 2015, defendants recommended a spinal fusion and the removal of two cysts, which had developed since plaintiff had started his treatment. Plaintiff considered his pain to be intolerable, and he decided to go through with the proposed procedures.

On May 27, 2015, Keiper performed on plaintiff L4-5 microlaminotomies and medial facetectomies, resec-tion of bilateral synovial cysts, and, particularly relevant to this appeal, an operation that fused two of plaintiff's ver-tebrae with a titanium cage and bilateral pedicle screws.[1] Unlike a surgery in which a single incision is made, Keiper operates through two incisions on the sides of the vertebrae. Keiper monitored the surgery using fluoroscopy (X-rays taken during the course of surgery), neuromonitoring, and EMG reports. The pedicle screws were placed by guidewires and a device known as a Jamshidi. During the May 27 sur-gery, the neuromonitoring alarm went off, and Keiper repo-sitioned the placement of a pedicle screw. He did not note the alarm or the redirection of the pedicle screw in the operative or discharge reports.

When plaintiff awoke from surgery, he did not have the strength to raise his left foot. Plaintiff was told that he had "foot drop," and Peterson, Keiper's physician assistant, reassured plaintiff that the foot drop would soon get better. Plaintiff was given Decadron—a strong anti-inflammatory steroid that rapidly reduces swelling. Plaintiff did not remember noticing improvement after he was given the intravenous steroid, but Keiper noted by chart that there

---

[1] All subsequent references to "the surgery" refer to the May 27, 2015, surgery.

was improvement. Defendants never told plaintiff that the neuromonitoring alarm had gone off or that there was any issue with the placement of the pedicle screw.

After the surgery, plaintiff made several visits to defendants' office over the next three months to address his foot drop, which had not improved. In the course of those visits, Keiper and Peterson examined plaintiff and ordered X-rays, magnetic resonance imaging (MRI), an electromyelogram (EMG), and nerve conduction velocity testing. Plaintiff was continually told by defendants that there was nothing wrong with the placement of the fusion hardware. Indeed, according to defendants, the placement of the pedicle screws was "excellent," "perfectly placed," and "textbook." In defendants' view, in light of plaintiff's continued sciatica and foot drop (at 2/5 strength), it was likely that the affected "nerve root is dysfunctional due to manipulation during surgery." In August, plaintiff was insistent in asking if there was more testing to be done, because he did not understand what was causing his condition. At that point, plaintiff's foot was "just dead." Defendants ordered a CT myelogram, and, on August 13, defendants told plaintiff that the pedicle screws needed to be removed and replaced with a clamp but did not explain to him that the CT myelogram showed that the L4 pedicle screw was breaching the L4 vertebra, possibly to the extent that it was affecting the nerve root.

Plaintiff's final appointment with defendants was on August 31. Afterwards, plaintiff decided to get a second opinion. Plaintiff went to another neurosurgeon at OHSU on September 15, but it was not until sometime in October that OHSU received the CT myelogram. The neurosurgeon at OHSU explained to plaintiff that the CT myelogram showed that a pedicle screw had breached the L4 vertebra, and the neurosurgeon recommended removing the screw. On December 9, the earliest that surgery could be scheduled, OHSU surgeons removed the left L4 pedicle screw and rod. Plaintiff's foot drop did not improve.

Plaintiff brought this medical malpractice action against defendants, alleging six specifications of negligence, of which the following four are relevant to the issues on appeal: defendants failed to perform the May 27, 2015,

surgery skillfully by incorrectly placing the L4 pedicle screw (allegation (a)); defendants failed to obtain and record appropriate imaging and nerve root monitoring studies to document whether the screw was misplaced and whether the nerve root was damaged at the time of the May 27, 2015, surgery (allegation (b)); defendants failed to inform the patient of the malpositioned screw and fragmented bone and their probable causation of his sciatica and foot drop following the May 27, 2015, surgery, leading to an unreasonable delay in removal of the offending screw (allegation (c)); and defendants failed to provide personal and skilled aftercare following surgery by delegating to a physician assistant key decision-making during follow-up visits after surgery (allegation (f)).[2]

At trial, Dietrich, a neurosurgeon who was limited by the court about the negligence allegations about which he was qualified to testify, testified about the standard of care concerning allegation (b)—the failure to order appropriate imaging tests in light of plaintiff's foot-drop symptom that presented immediately after surgery—and whether the position of the L4 pedicle screw was in a position to impinge on the L4 nerve. Based on his review of the CT myelogram and plaintiff's foot drop, Dietrich had no doubt that the L4 pedicle screw had breached the medial canal, that it "certainly" affected the L4 nerve, and that it was likely that the L4 pedicle screw affected the L5 nerve root. In sum, with the requisite degree of medical certainty, Dietrich testified that the pedicle screw was responsible for damaging the L4 and L5 nerve roots. He further testified that, the sooner that the source of an injury to a nerve root is removed, the more likely that the injury will abate.

In Dietrich's opinion, not only should defendants have ordered imaging tests when plaintiff's foot drop presented immediately after the May 27 surgery, the tests that were ordered—an X-ray on June 9 and an MRI on June 10— were inadequate to definitively determine whether the pedicle screw was breaching the medial canal. If the foot

---

[2] Not at issue on appeal are the allegations that defendants were not truthful about what caused plaintiff's foot drop and that defendants failed to warn plaintiff that foot drop was a risk of the spinal-fusion surgery.

drop was due to manipulation during surgery, it would be expected that the foot drop would persist for two or three days and then improve gradually as swelling receded. The MRI that was taken was not adequate to ascertain the position of the pedicle screws, mainly because magnetic artifact distorts the image, preventing accurate interpretation of whether the pedicle has been breached by any of the screws. The CT myelogram definitively showed the pedicle-screw breach, and it was below the standard of care to wait until August 13 to ascertain the cause of the foot drop.

Dietrich concluded his testimony by stating that defendants' failure to obtain appropriate imaging studies at the time of plaintiff's surgery to ascertain whether a pedicle screw was misplaced and was damaging the nerve root fell below the standard of care. Further, plaintiff's nerve damage was permanent, and, it was "more likely than not" that, had the breached pedicle screw been removed earlier than it was, plaintiff would have had some improvement of his foot drop.

At the close of trial, defendants moved for a directed verdict on all claims. Concerning allegation (b), defendants asserted that our decision in *Chouinard v. Health Ventures*, 179 Or App 507, 39 P3d 951 (2002), stands for the proposition that, to prove causation, expert testimony is required to define the extent or degree of an alleged injury and that, without such testimony, a jury would have to impermissibly speculate about the injury that had occurred and would not have a measure upon which to decide the amount of damages to award. In defendants' view, because Dietrich testified that plaintiff would probably have had *some* improvement in his foot drop had defendants diagnosed and addressed the malpositioned screw earlier, but Dietrich could not provide more specificity than that about the effect of defendants' negligence, plaintiff had failed to provide expert testimony that would establish causation of his injury.

Plaintiff disputed defendants' understanding of *Chouinard* and argued that there was *no* evidence in *Chouinard* that the defendants' negligence had caused the plaintiff's injuries whereas, here, Dietrich had provided evidence sufficient to establish causation and damages. The

trial court agreed with defendants and granted a directed verdict.

## II.   ANALYSIS

### A.   *Directed Verdict: Causation*

A trial court decision to grant a directed verdict against a plaintiff's claim is reviewed for legal error, and the grant of such a verdict is appropriate only when the defendant is entitled to judgment as a matter of law. *Miller v. Columbia County*, 282 Or App 348, 349, 385 P3d 1214 (2016), *rev den*, 361 Or 238 (2017). That is, a directed verdict is appropriate only in the exceptional case where reasonable people could draw only one inference and that inference is that defendant was not liable. *Hall v. State of Oregon*, 43 Or App 325, 328, 602 P2d 1104 (1979), *aff'd*, 290 Or 19, 619 P2d 256 (1980). Consequently, the evidence is viewed in the light most favorable to the plaintiff, as the nonmoving party, affording the plaintiff every reasonable inference that can be drawn from it. *Wheeler v. LaViolette*, 129 Or App 57, 60, 877 P2d 665 (1994).

The elements of a claim for medical malpractice include: (1) a duty that runs from the defendant to the plaintiff; (2) a breach of that duty; (3) harm that is measurable in damages; and (4) a causal link between the breach and the harm. *Rustvold v. Taylor*, 171 Or App 128, 132, 14 P3d 675 (2000). On appeal, plaintiff's challenge to the directed verdict concerns the last element—causation—and the parties reprise their arguments about the import of *Chouinard* and its bearing on causation. Consequently, our task is to determine whether plaintiff's expert testimony had to establish the degree of harm caused by the malpositioned pedicle screw to prove causation. We begin that task by discussing *Chouinard*.

In *Chouinard*, the plaintiff, who had reported that she was listing to one side and felt disoriented, underwent a CT scan. The defendant radiologist who read the scan did not see any abnormality on it. The plaintiff's symptoms worsened, and she experienced other severe symptoms to the point that she could neither work nor care for her children. Four months later, the plaintiff underwent

an MRI scan, and that scan revealed the presence of a three-centimeter tumor at the base of her brain. The tumor was malignant and was mostly removed by surgery. 179 Or App at 509-10. The plaintiff brought a medical malpractice action against the defendants and alleged that the defendants' failure to diagnose the tumor had caused or aggravated various physical and emotional problems that the plaintiff had experienced during the four-month delay between the CT scan and the surgery, and she sought pain-and-suffering damages for the period that her brain tumor had gone undiagnosed. *Id*. at 510. At trial, none of the doctors who testified could say to a reasonable medical probability that the undiagnosed tumor had caused plaintiff's physical problems. *Id*. at 511-12. Rather, the doctors testified to the nature of the tumor and that the plaintiff's symptoms could have been caused by other conditions, such as multiple sclerosis, stress, or an inner-ear infection. *Id.* at 513. The defendants successfully moved for a directed verdict on the ground that the plaintiff had failed to provide any expert testimony that the defendants' failure to diagnose the tumor had caused the plaintiff's symptoms. *Id*. at 511.

On appeal, the plaintiff did not dispute that no expert had testified to a reasonable medical probability that the tumor had caused her symptoms. *Id.* at 512 (citing *Cleland v. Wilcox*, 273 Or 883, 887-88, 543 P2d 1032 (1975), for the general rule that "a plaintiff in a medical malpractice case must offer expert testimony that, to a reasonable medical probability, the alleged breach of the standard of care caused the plaintiff's injuries"). In the plaintiff's view, however, tumors and their symptoms are a matter of common knowledge, and, therefore, the evidence was sufficient to permit the jury to infer causation even in the absence of expert testimony. *Id*. at 513. We disagreed. The issue whether the tumor had caused the plaintiff's nausea, headaches, and vertigo was a complex medical question, given that the plaintiff's symptoms could have been caused by other conditions, particularly in light of the plaintiff's long history of migraines. Consequently, to prevent mere speculation on the part of the jury about the cause of the plaintiff's symptoms, expert testimony was required to "bridge

that gap" between the complex relationship of the tumor and the plaintiff's symptoms. *Id*.

Turning to this case, plaintiff acknowledges that the placement of the pedicle screw and its relationship to his foot drop is complex and requires expert testimony to bridge the gap in a jury's understanding. Unlike the circumstances of *Chouinard*, however, plaintiff contends that Dietrich *did* testify to a reasonable medical probability that, had defendants diagnosed and addressed earlier the malpositioned pedicle screw, plaintiff would have recovered some of his foot strength. Plaintiff is correct in that respect; this case is different from *Chouinard* insofar as the issue in this case is not whether a jury could infer causation in the absence of expert testimony. *Chouinard*, however, does not resolve whether an expert must testify about the degree of injury caused by a negligent act to provide expert testimony sufficient to establish causation.

In Oregon, when we refer to the "causation" element, we ordinarily mean "causation-in-fact" or "but-for" causation. *Watson v. Meltzer*, 247 Or App 558, 565, 270 P3d 289 (2011), *rev den*, 352 Or 266 (2012) (citing *Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or 329, 340, 83 P3d 322 (2004)). That is, a plaintiff must prove causation in a negligence action by establishing that "but for the negligence of the defendant, the plaintiff would not have suffered the harm that is the subject of the claim." *Id*. (citing *Joshi v. Providence Health System*, 198 Or App 535, 538-39, 108 P3d 1195 (2005), *aff'd*, 342 Or 152, 149 3d 1164 (2006) ("'Cause-in-fact' also has a well-defined legal meaning: it generally requires evidence of a reasonable probability that, but for the defendant's negligence, the plaintiff would not have been harmed.")). *See also Horn v. National Hospital Association*, 169 Or 654, 679, 131 P2d 455 (1942) (to prove causation, the plaintiff had to "show that competent action would have been substituted for negligent inaction, and that there was a reasonable probability that the subsequent ailments would have been less if the substitution had been made"). In one respect, Dietrich's testimony appears to satisfy that but-for meaning: But for defendants' failure to diagnose and address the position of the pedicle screw, plaintiff would not have as

severe a foot drop as he does. In another respect, however, because Dietrich did not quantify or delineate the degree of the foot drop caused by defendants' failure to timely diagnose and address the pedicle screw's positioning, there is not expert evidence on the degree of the injury caused by defendants' negligence.

The Supreme Court has held, however, that certainty about the degree of harm is not necessarily required to prove causation. In *Hansen v. Bussman*, 274 Or 757, 759, 549 P2d 1265 (1976), the plaintiff was born with congenital hypothyroidism, which is a rare disease in which the thyroid gland does not function normally. If it is treated within three months of birth, the disease may cause little or no intellectual disability. *Id*. at 759-80. The plaintiff's hypothyroidism, however, was left undiagnosed and untreated at an early age, and the plaintiff suffered substantial intellectual disability. *Id*. at 762. The plaintiff provided testimony that, if congenital hypothyroidism is treated earlier in an infant's life, the odds are better that the infant's IQ will be within the normal range. *Id*. at 760. At trial, the defendant moved for a nonsuit and a directed verdict, which were denied. *Id*. at 782. On appeal, the defendant argued that there was no evidence of *how much* intellectual disability had resulted from the failure to timely diagnose and treat the plaintiff's condition and that recovery for negligence cannot rest on speculation. *Id*. at 783. The Supreme Court, in rejecting that argument, said that, "as a matter of reasonable probability, defendant's failure to make a reasonably prompt diagnosis resulted in at least some substantial impairment of [the plaintiff's] mental development." *Id*. at 784.

Further, the court rejected the defendant's argument that "the evidence was insufficient to show *how much* additional [intellectual disability] resulted from the failure of [the defendant] to make a prompt diagnosis of hypothyroidism, including the amount of [intellectual disability] that may have occurred prior to the date when a correct diagnosis would have been made by him." *Id*. at 785 (emphasis in original). The court said that the correct rule on causation is that "there be definiteness of proof both that harm resulted from defendant's wrongful conduct and also

'as to the amount of damage *as far as is reasonably possible*.'" *Id.* (quoting *Fehely v. Senders*, 170 Or 457, 135 P2d 283 (1943) (emphasis added)). The court then set out a quotation from *Restatement of Torts* section 912 comment a (1939), on which it had relied in *Fehely*:

> "'*** It is even more desirable, however, that an injured person shall not be deprived of substantial compensation merely because he cannot prove with complete certainty the extent of harm he has suffered. Particularly is this true in situations where there [cannot] be any real equivalence between the harm and compensation in money, as in case of emotional disturbance, or where the harm is of such a nature as necessarily to prevent anything approximating accuracy of proof, ***.'"

*Id. See also Restatement (Second) of Torts* § 912 (1979) (proof of the extent of harm and damages is required "with as much certainty as the nature of the tort and the circumstances permit"); *id.*, comment a ("It is desirable, also, that there be definiteness of proof of the amount of damage as far as is reasonably possible. It is even more desirable, however, that an injured person not be deprived of substantial compensation merely because he cannot prove with complete certainty the extent of harm he has suffered."); *Bigelow v. RKO Radio Pictures*, 327 US 251, 265, 66 S Ct 574, 90 L Ed 652 (1946) ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.").[3]

In light of *Hansen*, we conclude that the trial court erred when it ruled that Dietrich's testimony that defendants' negligent conduct had caused some of plaintiff's foot drop was legally insufficient to prove causation. Rather, the proper question for purposes of the directed verdict was whether the proof of the injury caused by defendants' negligence was provided with as much certainty as the

---

[3] Definiteness of proof as far as reasonably possible for the degree of harm is closely related to the proof required for damages, as the *Hansen* court suggested. We applied that principle in *Harris v. Kissling*, 80 Or App 5, 11, 721 P2d 838 (1986), on the proof required for damages based on future medical expenses. We said there that "many variables unavoidably enter into determining what future medical expenses might be necessary, and complete 'accuracy of proof' cannot be expected. *** The evidence of future damages was as certain as was reasonably possible." *Id.*

circumstances permitted. We conclude that it was. A jury could have found that a pedicle screw left in a position to impinge a nerve root is likely to cause lasting injury, and, given Dietrich's testimony and the record, plaintiff provided proof of the injury caused by defendants' negligence with sufficient certainty for plaintiff's claim to reach the jury. With that said, there is evidence in the record from which a jury could find that it was below the standard of care for defendants not to order appropriate imaging to rule out a misplaced pedicle screw as the source of the foot drop, and, had defendants identified and addressed the misplaced pedicle screw earlier, it was probable that plaintiff's condition would have improved. The trial court erred in concluding that that evidence was legally insufficient to establish causation.

B.  *Qualification of Dietrich*

We turn to plaintiff's contention that the trial court erred in ruling that Dietrich was not qualified by training or experience to provide expert testimony concerning allegations of negligence (c) and (f)—*viz.*, failure to inform plaintiff of the malpositioned pedicle screw and failure by Keiper to personally provide post-surgical care to plaintiff.

At trial, Dietrich began his testimony by discussing his experience as a neurosurgeon. He testified that he has been a board-certified neurosurgeon since 1974, that he practiced in southwest Washington for over 20 years, and that he had been the medical director of a hospital in Vancouver, Washington. As the hospital's medical director, Dietrich was responsible for determining whether the appropriate level of care was being provided to patients, occasionally reviewing chart notes of doctors who had performed spinal surgeries. In his practice as a neurosurgeon, Dietrich had treated thousands of patients with back pain, and the bulk of his practice was spinal surgery, both cervical and lumbar, including surgeries for lumbar stenosis and sciatica. Those surgeries included roughly two thousand microlaminotomies and facetectomies that were performed to relieve compression of the spinal canal. Dietrich did not have experience performing spinal fusion surgery, other than emergency surgeries for spinal trauma, but he

had collaborated with orthopedic surgeons in his medical practice group when his patients needed spinal fusions, in which he would do the nerve decompression surgery, and the orthopedic surgeon would, if necessary, do the fusion procedure. Dietrich frequently observed the latter part of the spinal surgery. Dietrich also was familiar with foot drop and its causes.

On cross-examination, defendants questioned Dietrich about his never having placed pedicle screws using fluoroscopy, and, given that Dietrich had not performed that procedure, they contended that he did not have the requisite knowledge to testify about the procedure. Plaintiff responded that the purpose of Dietrich's testimony was not to discuss the "deep minutiae" of how the procedure was performed but to illustrate that there was an "obvious, gross mistake in the breach of the pedicle wall" and the "follow-up steps [that] were taken to diagnose and appropriately treat" the malpositioned pedicle screw. The trial court agreed with defendants and restricted the subjects about which Dietrich could testify, except that it ruled (as noted in the causation discussion above) that Dietrich could testify about allegation (b)—*viz.*, the failure to use the correct imaging test once defendants saw plaintiff's foot drop after surgery—and whether the malpositioned pedicle screw had impinged on plaintiff's nerve.

Plaintiff does not challenge on appeal the trial court's ruling that Dietrich was not qualified to testify about the standard of care in performing the surgery (allegation (a)). Rather, plaintiff contends that the trial court erred when it ruled that Dietrich was not qualified to testify as an expert on two post-surgical-care allegations—*viz.*, failing to timely inform plaintiff of the malpositioned pedicle screw (allegation (c)) and failing to provide personal and skilled aftercare following the spinal fusion surgery (allegation (f)).

A plaintiff must prove that the defendant failed to "exercise that degree of care and skill which an ordinary practitioner, in the same discipline in that community or a similar community, would exercise." *Creasy v. Hogan*, 292 Or 154, 165, 637 P2d 114 (1981). And, under OEC 702, what qualifies an expert to give an opinion on the standard of

care is whether the expert has the necessary knowledge to provide testimony that can help the jury in understanding the standard. *Trees*, 354 Or at 209; OEC 702 ("If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."). Further, when assessing an expert's qualification to testify, the assessment looks to "substance," that is, an expert's knowledge, and does not necessarily rely on an expert's particular medical degree or area of specialty. *Id.* at 209. In other words, what is important is that an expert has "the necessary skill and knowledge to arrive at an intelligent conclusion about the subject matter in dispute." *Burton v. Rogue Valley Medical Center*, 122 Or App 22, 26, 856 P2d 639, *rev den*, 318 Or 24 (1993). Whether the trial court ruled correctly on an expert's qualifications is reviewed for legal error. *State v. Dunning*, 245 Or App 582, 589-90, 263 P3d 372 (2011).

Plaintiff points to the fact that Dietrich is a board-certified neurosurgeon who has over 30 years of experience as a neurosurgeon, including regularly performing spinal surgeries. For both allegations (c) and (f), plaintiff posits that Dietrich's experience as a medical director in reviewing chart notes of other doctors is particularly relevant. Given that experience and training as a neurosurgeon and hospital medical director, plaintiff argues that Dietrich was well-qualified to help the jury understand the post-surgical standard of care owed to plaintiff and whether defendants breached it.

In defendants' view, although both Dietrich and Keiper are neurosurgeons, Dietrich was nevertheless unfamiliar with the "minimally invasive surgery" that Keiper performed on plaintiff. Defendants contend, as a consequence, that Dietrich does not have the skill or knowledge necessary to have an opinion on the standard of care applicable to allegations (c) and (f). Defendants fix their attention on the complexity of the surgery, and the best that we can understand about their argument concerning defendants' post-surgical care is that they implicitly contend that an

expert must understand the complexities of the surgery itself to be qualified to give an opinion on the standard of post-surgical care for that surgery.

Defendants' argument is not well taken. Dietrich's task as an expert witness was to explain to the jury, given that the pedicle screw was malpositioned, the appropriate steps to be taken in plaintiff's post-surgical care, *viz.*, defendants should have explained the screw's position to plaintiff and Keiper should have been more personally involved in plaintiff's post-surgical care. The knowledge required to address those issues was knowledge about the extent of the breach of the pedicle screw past the medial aspect of the L4 pedicle and its effect on plaintiff's nerve root. The difficulty for defendants' position is that Dietrich did have the requisite expertise about what had happened neurologically to plaintiff.

To begin with, Dietrich evinced that knowledge when he testified to allegation (b)—that defendants had failed to obtain imaging studies after the surgery to assess whether a misplaced pedicle screw was damaging plaintiff's nerve root. Dietrich's knowledge of lumbar neurology and foot drop—which he had obtained by his training and experience as a neurosurgeon—allowed him to helpfully explain to the jury what the standard of care was on ordering imaging studies. Likewise, that same understanding of the L4 and L5 vertebrae and the effect of the pedicle screw on the nerve root was sufficient to form a basis to explain what defendants should have told plaintiff about the cause of his foot drop and the extent to which Keiper should have been involved in plaintiff's care.

Although it is true that Keiper used fluoroscopy and neuromonitoring during the surgery to make smaller and less-invasive incisions to place the screw and rod instrumentation, and that Keiper made some initial determinations about the pedicle screw's positioning based on the neuromonitoring and fluoroscopy, it does not follow that assessment of the pedicle screw's position after the surgery could not be made by another neurosurgeon, who was familiar with neurological processes, by reviewing the operation

notes and post-surgical diagnostic imaging. That is, once the pedicle screws were positioned in the spine, detecting where the screws were positioned and determining how much a screw impinged on plaintiff's nerve root rely on methods other than Keiper's surgical techniques. Moreover, to the extent that defendants assert that Keiper could rely on his assessment of how the pedicle screws were placed during surgery to gauge what was required after surgery, defendants could certainly rely on that for purposes of the weight of the proof of negligence, but that argument does not preclude a conclusion that Dietrich has the requisite knowledge and expertise to testify otherwise.

Accordingly, Dietrich's education, training, and extensive experience in neurosurgery and post-surgical care sufficiently qualified him to testify about what defendants should have communicated to plaintiff about the pedicle screw and whether Keiper should have been more personally involved with plaintiff's post-surgical care. Board certified as a neurosurgeon with three decades of neurosurgical experience, Dietrich is well versed in neurological processes and spinal anatomy and, specifically, foot drop. Although he had not performed elective spinal fusions himself, Dietrich had worked closely with orthopedic surgeons in his medical group who did spinal fusions, had performed thousands of neurosurgeries, including surgery for spinal stenosis (plaintiff's condition), and had reviewed spinal-fusion surgery charts. In his role as medical director of a Vancouver-area hospital, he had been responsible for reviewing the chart notes of other doctors, and for disciplining doctors when necessary. In this case, Dietrich's experience as a neurosurgeon meant that he was well situated to understand the appropriate steps necessary to care for plaintiff after surgery so that he could assist the jury in resolving whether defendants' post-surgical efforts, or lack of efforts, deviated from the standard of care.

In sum, the trial court erred in granting a directed verdict on the ground that plaintiff had not proven causation. Further, the court erred in ruling that Dietrich was not qualified to testify about the standard of care related to plaintiff's post-surgical care, *viz.*, informing plaintiff about

the placement of the pedicle screw and failing to provide personal and skilled attention to plaintiff's drop-foot injury.

Reversed and remanded.