232 May 6, 2026 No. 362

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

GARY WALTER HIGGS,
*Plaintiff-Respondent,*

*v.*

R.J. REYNOLDS TOBACCO COMPANY, INC.,
a foreign corporation,
*Defendant-Appellant,*

*and*

WEST LINN NORTH LIQUOR STORE et al.,
*Defendants.*

Multnomah County Circuit Court
19CV22906; A180635

Angela F. Lucero, Judge.

Argued and submitted December 6, 2024.

Brian C. Lea argued the cause for appellant. Also on the briefs were Brian R. Talcott, Charles R.A. Morse, and Jones Day.

James S. Coon argued the cause for respondent. Also on the brief was Thomas, Coon, Newton & Frost.

Before Ortega, Presiding Judge, Hellman, Judge, and O'Connor, Judge.*

ORTEGA, P. J.

Affirmed.

_____
* O'Connor, Judge, *vice* Mooney, Senior Judge.

**ORTEGA, P. J.**

As a result of smoking cigarettes manufactured by defendant R.J. Reynolds, plaintiff developed chronic obstructive pulmonary disease (COPD). The jury found defendant liable to plaintiff on his claims for product liability, negligence, and fraud, and awarded $100,000 in economic damages and $18 million in noneconomic damages, allocating 30 percent comparative fault to plaintiff and 70 percent fault to defendant. On appeal from the resulting judgment, defendant asserts two assignments of error[1]: that the trial court erred in denying defendant's motion for directed verdict on plaintiff's fraud claim and that the trial court delivered a legally erroneous instruction on fraudulent concealment. Although defendant only challenges the fraud claim, it contends those errors entitle it to a new trial on all of plaintiff's claims, or, at a minimum, a reduction in plaintiff's damages based on the jury's comparative fault findings.

We first conclude that the trial court did not err in denying defendant's motion for directed verdict, because the evidence, viewed in the light most favorable to plaintiff, was legally sufficient to support a jury finding in his favor on the fraud claim based on the theories that he presented to the jury. We also conclude that the court's instruction to the jury on fraudulent concealment was not legally erroneous in any of the ways claimed by defendant. Therefore, we affirm.

## I.   FACTS RELEVANT TO PLAINTIFF'S FRAUD CLAIM

We start by stating the facts relevant to plaintiff's fraud claim, which is the only claim challenged by defendant on appeal. Given that the jury found in plaintiff's favor on that claim, we review the facts in the light most favorable to plaintiff. *See, e.g.*, *Brown v. J. C. Penney Co.*, 297 Or 695, 705-06, 688 P2d 811 (1984) (on review of a denial of a directed verdict, stating, "The jury weighed the evidence, judged the credibility of the witnesses and resolved all

---

[1] In its opening brief, defendant raised a third assignment of error to the trial court's refusal to dismiss three jurors for cause. At oral argument, defendant withdrew that assignment. Based on the Supreme Court's case in *State v. Villeda*, 372 Or 108, 546 P3d 268 (2024), the decision to withdraw that assignment is well taken.

conflicts in the evidence; therefore, we are entitled to state as fact that which there was evidence to support."); *Dosanjh v. Namaste Indian Restaurant, LLC*, 272 Or App 87, 91, 353 P3d 1243 (2015) ("We view the evidence supporting the giving of an instruction in the light most favorable to the party requesting the instruction and, given that light, determine as a matter of law if the instructional ruling was correct.").

Plaintiff began smoking in 1963, at the age of 16. Between 1963 and 2017, plaintiff smoked only Winston cigarettes, which were manufactured, marketed, and sold by defendant until 2015. In May 2017, plaintiff was diagnosed with COPD. That same month he successfully quit smoking with medical intervention, after previous failed attempts to quit beginning in 2005 after surgery for a cyst in his throat. In May 2019, plaintiff sued defendant for damages related to his COPD, alleging claims for fraud, strict liability, and negligence. As to the fraud claim, plaintiff alleged that defendant intentionally or recklessly made misrepresentations and concealed information about its tobacco products through an ongoing effort to manipulate public opinion and create doubt and confusion about those products' effects on health and addiction, which caused cigarette smokers like plaintiff to start and continue smoking despite adverse effects. Plaintiff further alleged that he reasonably relied on defendant's misrepresentations.

We only briefly recount some of the evidence that plaintiff presented at trial about the history of tobacco companies' efforts to sow doubt that cigarette smoking is addictive or causes disease.[2] In December 1953, following a decline in sales after publicity surrounding studies finding

_____

[2] For a fuller account of some of that history, including the tobacco industry's suppression and manipulation of research efforts, much of which plaintiff also introduced in this case, see *Estate of Michelle Schwarz v. Philip Morris Inc.*, 206 Or App 20, 30-32, 135 P3d 409 (2006), *aff'd*, 348 Or 442, 235 P3d 668, *adh'd to on recons*, 349 Or 521, 246 P3d 479 (2010) (discussing research generally; evidence on low-tar cigarettes in *Schwartz* was not introduced in this case), and *Williams v. Philip Morris Inc.*, 182 Or App 44, 52, 55-58, 48 P3d 824, *adh'd to on recons*, 183 Or App 192, 51 P3d 670, *rev den*, 335 Or 142 (2002), *vac'd and rem'd,* 540 US 801, 124 S Ct 56, 157 L Ed 2d 12 (2003), *readopting reasoning on remand*, 193 Or App 527, 92 P3d 126 (2004), *aff'd*, 340 Or 35, 127 P3d 1165 (2006), *vac'd and rem'd on other grounds*, 549 US 346, 127 S Ct 1057, 166 L Ed 2d 940 (2007), *readopting disposition on remand*, 344 Or 45, 176 P3d 1255 (2008), *cert dismissed as improvidently allowed*, 556 US 178 (2009).

a link between smoking and lung cancer, tobacco companies met and created the advocacy group Tobacco Industry Research Council (TIRC), which later split into the Tobacco Institute (TI) and the Council for Tobacco Research (CTR), to speak for the tobacco industry as a whole. There were also other committees and groups, about 20 in total, formed over the years to handle different aspects of the tobacco industry's effort to deny the health effects of smoking and to block limitations on access to cigarettes and places to smoke. Defendant was one of the companies that funded those groups proportionate to its market share of the cigarette market.

Beginning in January 1954 and continuing through the 1990s, those advocacy groups used public statements, press conferences, news appearances, newsletters to doctors, short films, and large-scale advertising and paid third-party scientists to present the tobacco companies' position to the public, as well as providing selective research funding on alternative causes of diseases linked to smoking. At first, the message was to deny any problems with smoking. In January 1954, the "Frank Statement" was published in nearly every newspaper in the United States with readership over 20,000. In the Frank Statement, the signatories stated that they believed that their products were not injurious to health and announced the establishment of TIRC to conduct research into tobacco use and health. Throughout the decades of the advocacy groups' operation from 1954 to 2000, the goal was to create doubt about the harmful effects of smoking so that the public believed that whether cigarette smoking caused any adverse health effects or whether smoking was addictive were open questions with no proof of causation. Defendant intended for the public to rely on the messaging as accurate. Internally, defendant acknowledged that the true purpose of the advocacy groups was to create a "united front" public relations effort for all tobacco companies to deny the effect of cigarette smoking and to create doubt and distraction. On at least 14 occasions, executives for the tobacco industry even made public pledges that, if there were real evidence of cigarettes causing harm, they would stop selling and go out of business.

Plaintiff's expert on this history, Dr. Proctor, testified that there was no possibility that a child in the 1950s and 1960s, such as plaintiff, would not have seen cigarette advertising on television. In those decades, it was not generally known that cigarettes cause death or harm or that they are addictive, and smoking was ubiquitous in American culture, with many cigarette advertisements directed at children and teenagers. In the 1970s, cigarette advertisements were no longer on television, but the industry switched to billboards, product placement in movies, and sponsoring sports. Plaintiff also presented evidence of representative samples of messaging and advertisements over the decades, including advertisements for Winston-brand cigarettes. Plaintiff's expert on nicotine and addiction, Dr. Prochaska, testified that advertising affects a person's likelihood of starting and continuing to smoke and dissuades quitting because denial about the harm from smoking erodes motivation to quit.

Despite the decades of messaging otherwise, beginning in 1953, defendant's own internal research reported a causal link between cigarette smoking and lung cancer and that cancer-causing chemicals were present in the smoke. Defendant also acknowledged internally by 1963 that cigarettes were addictive due to the nicotine levels in them and, indeed, defendant controlled the amount of nicotine in their products to make them addictive. In 1958, British American Tobacco Company representatives reported that everyone they spoke with (with one exception), including American tobacco industry leaders, agreed that smoking was "an indispensable link" in any chain of events that leads to lung cancer. There was consensus in the scientific community about the relationship between smoking and lung cancer by the mid-1950s. The United States Surgeon General in 1964 released a report that smoking causes cancer and other disease, and in 1988, that nicotine causes addiction to smoking. Nevertheless, in the 1990s, defendant still maintained the public position that smoking was not addictive, did not cause cancer, and was not proven to contain carcinogens. It was not until 2000 that defendant finally admitted that smoking causes cancer.

Over the years, with each public warning, the tobacco advocacy groups pushed back to create doubt or controversy about any causal link between smoking and disease or addiction. In particular, tobacco companies sought to create a "psychological crutch" to keep smokers smoking. Different products were also created to give reassurance to smokers. In 1954, defendant introduced the Winston-brand of cigarettes—the brand plaintiff smoked—with a "filter" tip as a "reassurance brand," which sold well and became the leading brand in the United States from 1966 through the early 1970s. Filters were made pure white so that they darkened when smoke travelled through the filter. However, the filter did not trap harmful substances or make Winston cigarettes safer than an unfiltered cigarette. The filter was added to promote sales. Promotional material, magazine articles, and advertisements implied, and sometimes stated, that filters removed harmful parts of the smoke, such as tar and nicotine, and were marketed as part of a coordinated reassurance campaign by tobacco companies. It was the majority view, even among the medical community, that filters made cigarettes safer. Prochaska testified that the filter provides rationalization for a smoker to continue smoking because it is perceived as taking out harmful aspects of smoking.

Even after 2000, defendant's customers had a poor understanding that nicotine levels in cigarettes were set to maintain addiction, of the chemicals in cigarette smoke, and of how difficult it is to quit smoking. Defendant's customers also had a poor understanding of the seriousness of the diseases, or the different diseases, caused by cigarette smoking. The United States Food and Drug Administration did not regulate cigarette products until 2010, and certain existing cigarette brands, such as Winston, were not required to change even then.

Plaintiff testified that, when he started smoking in 1963, almost everybody smoked. When he tried his first cigarette at age 16, it was common to smoke, and he did not think it was dangerous. He saw and heard advertisements for smoking on television, radio, and billboards, and smoking was portrayed as cool in the movies. He believed the ads,

explaining that "[b]ack in that day you believed the advertisers, and I did." Plaintiff testified that "[t]hey had a filter on the cigarette that kept out the tar and nicotine. I believed them, and I decided to smoke. And it wasn't harming me." He admitted that he could not remember any specific ads or what date he saw the ads or whether he saw ads specific to Winston cigarettes, but he "believed the advertisers or the media, so I felt I wasn't doing any[thing] wrong so I continued to smoke."

When plaintiff smoked Winston cigarettes, he noticed the filter changed color, which made him think that the filter "was doing was [*sic*] it was supposed to do, filter out the bad and keep just the smoking." He did remember seeing tobacco representatives on television and "[t]he general message was that cigarettes were not harmful. There was a filter designed so it would keep out the tar and nicotine, so I believed them[.]" Plaintiff always smoked filtered cigarettes, because he believed they were filtering out the bad parts of the smoke, and he did not understand that smoking filtered cigarettes was harmful to his health until around 2005, when he had throat surgery.

After denying defendant's motion for a directed verdict, the trial court submitted plaintiff's claims of strict liability, negligence, and fraud to the jury. The jury returned a unanimous verdict for plaintiff on all his claims, awarding $100,000 in economic damages and $18 million in noneconomic damages, and allocating 30 percent comparative fault to plaintiff and 70 percent fault to defendant. Defendant appeals from the resulting judgment, asserting that the trial court erred in denying its motion for directed verdict on the fraud claim and in delivering the instruction on fraudulent concealment.

## II. CHALLENGES TO PLAINTIFF'S FRAUD CLAIM

In its two assignments of error, defendant challenges the trial court's submission of plaintiff's fraud claim to the jury and its jury instruction on fraudulent concealment. We start our analysis with a general discussion of the elements of fraud in Oregon and then address defendant's assignments of error separately.

## A.    *Common-Law Fraud*

The essential elements of a common-law fraud claim are that "the defendant made a material misrepresentation that was false; the defendant did so knowing that the representation was false; the defendant intended the plaintiff to rely on the misrepresentation; the plaintiff justifiably relied on the misrepresentation; and the plaintiff was damaged as a result of that reliance." *Strawn v. Farmers Ins. Co.*, 350 Or 336, 351-52, 258 P3d 1199, *adh'd to on recons*, 350 Or 521, 256 P3d 100 (2011), *cert den*, 565 US 1177 (2012); *see also Knepper v. Brown*, 345 Or 320, 329, 195 P3d 383 (2008) (noting that older cases listed nine elements for fraud, which list has been abbreviated). At trial, the plaintiff must prove each element by clear and convincing evidence. *Wieber v. FedEx Ground Package System, Inc.*, 231 Or App 469, 480, 220 P3d 68 (2009), *rev den*, 349 Or 664 (2011).

Liability for a false representation may result from an affirmative misrepresentation or from words or actions that conceal a material fact, "even though the misrepresentation is only implied." *Ogan v. Ellison*, 297 Or 25, 34, 682 P2d 760 (1984). When a party actively conceals a fact, there is no requirement that the party have a duty to speak; if the alleged act is "simple nondisclosure" then usually a duty to speak is required for the nondisclosure to be actionable. *Paul v. Kelley*, 42 Or App 61, 65-66, 599 P2d 1236 (1979). A party actively conceals a fact—meaning no duty to speak is required—through "'words or acts which create a false impression covering up the truth,'" actions that "'remove an opportunity that might otherwise have led to the discovery of a material fact,'" or "'even a false denial of knowledge by one in possession of the facts.'" *Id*. at 66 (quoting Prosser, *Law of Torts*, § 106, at 695 (4th ed 1971)); *see also Elizaga v. Kaiser Found. Hospitals*, 259 Or 542, 546-47, 487 P2d 870 (1971) (stating that "nondisclosure of material facts can be a form of misrepresentation where the defendant had made representations which would be misleading without full disclosure").

With that understanding in place, we turn to defendant's specific arguments.

B.    *Motion for Directed Verdict*

In its first assignment of error, defendant challenges the trial court's denial of its motion for directed verdict on plaintiff's fraud claim. On that assignment, "we review the evidence and any resulting inferences in the light most favorable to the party that obtained a favorable verdict"—here, plaintiff—and "[w]e do not weigh conflicting evidence or evaluate credibility when reviewing the record." *Currier v. Washman, LLC*, 276 Or App 93, 97, 366 P3d 811 (2016). Further, we cannot set aside the verdict "'unless we can affirmatively say that there is no evidence from which the jury could have found the facts necessary' to support the verdict." *Id.* (quoting *Brown*, 297 Or at 705). Thus, "a directed verdict is appropriate only in the exceptional case where reasonable people could draw only one inference and that inference is that defendant was not liable." *Johnson v. Keiper*, 308 Or App 672, 678, 481 P3d 994 (2021).

Defendant makes several arguments in support of its assignment of error. However, before we address those arguments, we first provide the context of plaintiff's theories of fraud in this case. As alleged in the complaint and argued to the jury, plaintiff alleged that defendant both made affirmative misrepresentations and concealed material information about its tobacco products and that he reasonably relied on those misrepresentations. Specifically, plaintiff argued that he relied on the industry's affirmative representations that smoking may not be a causal factor in disease and that filtered cigarettes were a healthier alternative, and that he was impacted by the overall confusion, doubt, and "controversy" defendant intentionally created over decades about the health effects from smoking. Plaintiff also argued, with respect to fraudulent concealment, that defendant intentionally created the impression that filters were safer both through the use of white filters that got darker from the smoke and by creating the false impression through advertisements and its advocacy groups' efforts that filters actually filtered out bad parts of the smoke. Plaintiff argued that he relied on those misrepresentations as presented in his testimony.

With that context, we address defendant's arguments, starting with those based on defendant's characterization of plaintiff's theories.

1.  *Plaintiff asserted legally cognizable theories of fraudulent concealment.*

We begin by addressing defendant's arguments that plaintiff's theories of fraudulent concealment were not legally cognizable. Defendant first asserts that plaintiff could not prove active concealment in this case, because such a theory requires a direct transaction between the parties. However, Oregon law imposes no such requirement. Defendant's effort to locate that requirement in the specific facts of certain cases is misplaced. Fraudulent concealment is not a separate claim that includes additional requirements; rather, concealing the truth through words or acts by creating a false impression, removing an opportunity to discover the truth, or making a false denial of knowledge are all means by which a defendant can make an actionable misrepresentation, even without having a duty to speak. *See, e.g.*, *Paul*, 42 Or App at 65-66; *see also U. S. National Bank v. Fought*, 291 Or 201, 220, 630 P2d 337 (1981) ("[A] business transaction between deceiver and deceived is not essential to an action for deceit.").[3] We reject defendant's contention that plaintiff was required to prove a direct transaction between himself and defendant to prove fraud by active concealment.

Defendant next asserts that plaintiff's concealment theory was not legally cognizable because it was based on simple nondisclosure and plaintiff presented no evidence that would have imposed on defendant a duty to speak and that, in any case, a simple nondisclosure theory is preempted by the Federal Cigarette Labeling and Advertising Act (Labeling Act). We reject both of those arguments, because plaintiff neither alleged nor argued that defendant

---

[3] Defendant relies on *U.S. National Bank* for its position, but defendant misreads that case. There, the Supreme Court directly stated that a business transaction is not necessary for a fraud claim under Oregon law. 291 Or at 220 (citing, among authorities, Prosser, *Law of Torts*, § 105, at 685 (4th ed 1971)). In that case, the court contrasted a common-law fraud claim in Oregon, which does not require a transaction, with the claim that the plaintiff brought under *Restatement (Second) of Torts*, section 551 (1977), which, by its terms, required a transaction. *U.S. National Bank*, 291 Or at 219. This case is not predicated on that *Restatement* section.

was liable for "simple nondisclosure." As explained above, plaintiff's theories of liability included concealment, but plaintiff's theory was that defendant was actively concealing material information through its conduct of its decades-long campaign of creating the false impression about the connection between smoking and disease and addiction and creating the false impression that the filters in filtered cigarettes filtered out bad or unhealthy parts of the cigarette smoke. Those theories rely on actions and words by defendant, either directly or through its industry advocacy groups and collusion with other tobacco companies, which intentionally created a false impression in the public. That theory comfortably fits within a common-law theory of fraud based on active concealment. *See, e.g.*, *Paul*, 42 Or App at 65-66.

We thus reject defendant's arguments that are based on its assertion that plaintiff was pursuing a theory of simple nondisclosure, because that was not the theory that he presented to the jury.

2.  *Plaintiff presented sufficient evidence to support his fraud claim.*

We next address defendant's argument that it was entitled to a directed verdict on plaintiff's fraud claim because he did not introduce evidence that he relied to his detriment on any misrepresentation or half-truth attributable to defendant. Specifically, defendant argues that plaintiff failed to connect any of the general evidence of statements by defendant and tobacco advocacy groups to any specific statement or advertisement that plaintiff relied on and did not connect his understanding of what a filter was to any misrepresentation by defendant. Defendant further argues that plaintiff did not rely on any concealment.

We begin by rejecting defendant's assertions that plaintiff had to identify any specific statements or advertisements on which he relied. We have previously held in the exact context of the tactics used by the tobacco industry that "a defendant may be liable for fraud for a misrepresentation that creates a false impression even though it is impossible to identify the specific misrepresentation on which a person

relied." *Williams v. Philip Morris Inc.*, 182 Or App 44, 51, 48 P3d 824, *adh'd to on recons*, 183 Or App 192, 51 P3d 670, *rev den*, 335 Or 142 (2002), *vac'd and rem'd*, 540 US 801, 124 S Ct 56, 157 L Ed 2d 12 (2003), *readopting reasoning on remand*, 193 Or App 527, 92 P3d 126 (2004), *aff'd*, 340 Or 35, 127 P3d 1165 (2006), *vac'd and rem'd on other grounds*, 549 US 346, 127 S Ct 1057, 166 L Ed 2d 940 (2007), *readopting disposition on remand*, 344 Or 45, 176 P3d 1255 (2008), *cert dismissed as improvidently allowed*, 556 US 178 (2009).

In *Williams*, we rejected the defendant's position that the plaintiff could not prove fraud without evidence that Williams "ever saw or heard a false or misleading statement made by or attributable to [the defendant.]" *Id.* at 52 (internal quotation marks omitted). We concluded that common-law fraud "is not limited to those who deal directly with the injured party. Rather, a person who makes a misrepresentation may be liable to the intended recipients of a misrepresentation without regard to whether the person making the representation intends to defraud a particular person." *Id.* at 53; *see also Coughlin v. State Bank of Portland*, 117 Or 83, 96, 243 P 78 (1926) ("Where misrepresentations are made to the public at large, or to a particular class of persons, with the intention of influencing any member of the public, or of the class, to whom they may be communicated, any one injured through proper reliance thereon may secure redress." (Internal quotation marks omitted.)). We also explained that, under Oregon law, a misrepresentation may be made in many different ways, including by "'the creation of a false impression by words or acts, or by any trick or device, a deep laid scheme of swindling, or a direct falsehood, a combined effort of a number of associates or the sole effort of a solitary individual.'" *Id.* at 54 (quoting *Pennebaker v. Kimble et al.*, 126 Or 317, 323-24, 269 P 981 (1928)).

In *Williams*, as in this case, the plaintiff's theory of fraud did not rely on a few fraudulent statements made to specific individuals; rather, the theory "[wa]s that [the] defendant, in concert with other tobacco companies, engaged in a decades-long public-relations effort to create the impression in the public that there was a legitimate controversy about the health effects of smoking, even though [the]

defendant knew that such an impression was false." *Id*. at 51. Plaintiff's theory of fraud in this case also encompassed defendant's public-relations effort to create an impression in the public that the filters on cigarettes make smoking safer or filtered out bad parts of the cigarette smoke, even though defendant knew that impression was false. "What matters is whether the representation was intended ultimately for the public or for a particular class of persons to which the plaintiff belongs." *Estate of Michelle Schwarz v. Philip Morris Inc.*, 206 Or App 20, 43, 135 P3d 409 (2006), *aff'd*, 348 Or 442, 235 P3d 668, *adh'd to on recons*, 349 Or 521, 246 P3d 479 (2010). Also, "[d]irect evidence of reliance in support of a fraud claim is not required; a plaintiff may prevail on a showing that a reasonable inference of reliance can be drawn from the facts in evidence." *Wieber*, 231 Or App at 482.

With that clarification of law, we address whether plaintiff presented sufficient evidence to survive defendant's motion for directed verdict and conclude that he did.

In this case, as outlined above, plaintiff presented evidence from which a jury could conclude that defendant, in collusion with other tobacco companies and the industry advocacy groups, engaged in a decades-long campaign, which included a variety of methods of messaging and suppressing or manipulating research. The jury could also conclude from the evidence that the purpose of the campaign was to convey to smokers and potential smokers that there was a legitimate controversy about whether a connection existed between cigarette smoking and adverse health effects, about whether cigarette smoking is addictive, and to portray filtered cigarettes as providing protection from unhealthy aspects of cigarette smoke. The evidence also permitted the jury to conclude that defendant intended that potential and current smokers would rely on the direct messages and impressions created to justify starting or continuing to smoke and that defendant created those impressions intentionally, knowing that the impressions were false.

Plaintiff also produced evidence from which a jury could conclude that defendant created filtered cigarettes, including the Winston brand used by plaintiff, as a

reassurance brand to smokers after declining sales in 1953 following public concerns about smoking causing lung cancer, with the intent to provide potential and current smokers a justification for smoking. The jury heard evidence supporting a conclusion that it was the common understanding of the public, including the public health community, that the filters in filtered cigarettes filtered out tar and nicotine, and were a safer or healthier alternative to unfiltered cigarettes, which false impression was directly supported by statements in industry advertising and which defendant knew was false. A jury could also conclude that defendant actively supported that false impression by intentionally making its filters white so that they darkened when smoke passed through the filter, to create the false impression that something was being filtered out of the smoke. Plaintiff produced evidence from which a jury could conclude that defendant intended to create that false impression about filters and that plaintiff was an intended recipient of that deceit. To put it simply, plaintiff presented sufficient evidence from which a jury could conclude that defendant made direct misrepresentations, and actively sought to conceal, through words and acts, the true dangers of smoking cigarettes and the truth about filters, and that defendant intended that people in plaintiff's position would rely on those misrepresentations.

Additionally, plaintiff presented sufficient evidence that he did in fact rely on defendant's misrepresentations. As set out more fully in the fact section, plaintiff testified that he saw the advertisements and industry statements and that he believed them. He believed the filter on his Winstons "kept out the tar and nicotine" and that "it wasn't harming me." He also knew that the filters on his Winston cigarettes darkened when he smoked, which made him think the filter was doing what it was supposed to do—filter out the bad parts of the smoke. Plaintiff always smoked filtered cigarettes, because he believed they were filtering out the bad parts of the smoke and he did not know that smoking filtered cigarettes was harmful until around 2005. As in *Williams*, "[t]he length of time over which defendant conveyed the message, and the nature of the misrepresentations on which [plaintiff] relied, make it unlikely that plaintiff could single out a specific instance from all of the

representations that [plaintiff] received." *Williams*, 182 Or App at 55. Nevertheless, the evidence presented was sufficient to support a jury determination that plaintiff reasonably relied on defendant's deceit to his detriment.

In arguing otherwise, defendant asserts that this case is factually distinguishable from *Williams* because plaintiff denied any reliance. In making that argument, defendant relies on plaintiff's answers to two questions asked on cross-examination in which he agreed with defense counsel that "[w]hen you were a smoker, there was nothing that any tobacco representative said that caused you to change any of your smoking decisions" and that "you weren't looking to see what tobacco companies were saying about smoking and health." We reject defendant's arguments for two reasons.

First, the testimony that defendant relies on, when viewed in the light most favorable to plaintiff, does not prove the point defendant thinks it does, as the messages coming from tobacco companies offered only support for plaintiff's decisions to smoke and to choose filtered cigarettes. He did not need to wait for a specific message because, as plaintiff testified, the messages supporting his decisions were already all around him. Plaintiff's agreement with those statements on cross-examination does not amount to a legal admission of no reliance, as urged by defendant. Second, on appeal, we are required to view the evidence in the light most favorable to plaintiff, and we will not weigh conflicting evidence or evaluate credibility. We cannot set aside the verdict "unless we can affirmatively say that there is no evidence from which the jury could have found the facts necessary to support the verdict." *Currier*, 276 Or App at 97 (internal quotation marks omitted). Under that standard, the trial court did not err in denying defendant's motion for a directed verdict, and we must affirm the jury's verdict.

C.  *Jury Instruction for Fraudulent Concealment*

In its second assignment of error, defendant argues that the trial court erred in giving Oregon Uniform Civil Jury Instruction (UCJI) 42.05 for fraudulent concealment because that instruction impermissibly allowed the jury to

find fraud based on "simple nondisclosure." In evaluating that assignment of error, "[w]e view the evidence supporting the giving of an instruction in the light most favorable to the party requesting the instruction and, given that light, determine as a matter of law if the instructional ruling was correct." *Dosanjh*, 272 Or App at 91. We review the trial court's decision to give the challenged jury instruction to determine whether the instruction, when read together with the other instructions, completely and accurately stated the law applicable to the case and, if not, whether any error in giving the instruction was prejudicial to the party opposing it. *See, e.g.*, *Wallach v. Allstate Ins. Co.*, 344 Or 314, 319-22, 180 P3d 19 (2008) (applying that standard).

Defendant challenges the following instruction, which was one instruction among several that applied to plaintiff's fraud claim:

> "FRAUDULENT MISREPRESENTATION—FALSE
> REPRESENTATION—CONCEALMENT

> "A person may make a false representation of a material matter by concealing the truth. A false representation by concealment occurs when a person, by any word or act, conceals a material matter either by creating a false impression covering up the truth, or by removing an opportunity that might otherwise have led to the discovery of the truth."

(Capitalization and underline in original.) Defendant specifically argues that the portion of the instruction that states "by removing an opportunity that might otherwise have led to the discovery of the truth" misstates the law.

Defendant first asserts that the instruction misstates the law because fraud by active concealment requires a direct transaction between the parties. That is a contention that we have already rejected above, and we do so again here.

Defendant next asserts that the instruction did not distinguish between active concealment, which can support a claim of fraud, and simple nondisclosure, which is not fraudulent without a duty to speak, because the instruction does not use the word "active" or otherwise require

affirmative conduct.[4] Without such language, defendant argues, the instruction conflates active concealment with mere silence. Defendant asserts that the legal problem here is that active concealment requires a corporation to be acting externally to itself, but the instruction would allow a jury to find active concealment for internal corporate acts, such as deciding not to publicly disclose information, which would constitute simple nondisclosure.

We do not agree with defendant's reading of the jury instruction. The challenged jury instruction explicitly states that fraud by concealment requires that "a person, *by any word or act*, conceals a material matter either by creating a false impression covering up the truth, or by removing an opportunity that might otherwise have led to the discovery of the truth." (Emphasis added.) A defendant cannot "create" or "remove" by "any word or act" by simply failing to disclose something, as those words require an action on the part of the person. *See Paul*, 42 Or App at 66 (explaining that active concealment includes "[a]ny words or acts which create a false impression covering up the truth, *** or which remove an opportunity that might otherwise have led to the discovery of a material fact" (internal quotation marks omitted; ellipsis in original)). We do not see a reasonable basis for defendant's reading of the jury instruction as allowing fraud to be supported by "simple nondisclosure."

Even if we could read the instruction, in isolation, as defendant asserts, when read with the other instructions on fraud it cannot be read the way that defendant contends. The instruction on fraudulent concealment sets out only one way that a person can make a fraudulent misrepresentation. In addition to other instructions on the fraud claim,[5]

---

[4] Defendant also asserts that the trial court further erred in rejecting defendant's clarifying jury instruction. However, defendant did not assign error to the trial court's refusal to give defendant's instruction, nor does defendant develop an argument supporting that contention. Thus, we do not consider that argument further.

[5] In addition to the instructions discussed, the court also gave instructions on fraudulent misrepresentation—false representation—half-truth; fraudulent misrepresentation—statement of opinion; fraudulent misrepresentation—promise of future performance; fraudulent misrepresentation—burden of proof; fraudulent misrepresentation—burden of persuasion—damages; and causation.

the jury was also instructed on the elements of fraudulent misrepresentation:

### "FRAUDULENT MISREPRESENTATION/DECEIT/ FRAUD—GENERAL

"To prevail on a claim of fraud by misrepresentation, the plaintiff must prove all of the following:

"(1)   [Defendant] made a false representation of a material matter;

"(2)   [Defendant] knew that the representation was false or recklessly made the representation without knowing if it was true or false;

"(3)   [Defendant] intended to mislead [plaintiff] and/or knew that it was misleading [plaintiff] and/or recklessly disregarded whether it was misleading [plaintiff];

"(4)   [Plaintiff] reasonably relied on the representation; and

"(5)   [Plaintiff] was damaged as a direct result of his reliance on the representation."

(Capitalization and underline in original.) The jury was separately instructed, under the heading "FRAUDULENT MISREPRESENTATION—MATERIAL" that "[a] false representation of a material matter is one that would be likely to affect the conduct of a reasonable person with regard to a transaction with another person." (Capitalization and underline in original.) As to reliance, the jury was instructed:

### "FRAUDULENT MISREPRESENTATION— REASONABLE RELIANCE

"In determining whether [plaintiff's] reliance on the statements of [defendant] was reasonable, you must consider the totality of the parties' circumstances and conduct. In doing so, you may consider factors such as:

"(1)   Any information known or obvious to [plaintiff] to confirm or refute [defendant's] statement;

"(2)   The relative status, knowledge, and experience of [plaintiff] and [defendant];

"(3)   The previous experience of [plaintiff] and [defendant] in similar transactions;

"(4)   Whether the statement was specific or general; and

"(5)   Whether the statement was a statement of fact or the expression of an opinion.

"To prove reliance, the plaintiff must prove that [plaintiff] was not aware that the representation was false."

(Capitalization and underline in original.) Finally, the jury was instructed:

<u>"FRAUDULENT MISREPRESENTATION—
REPRESENTATIONS MADE TO PERSONS OTHER
THAN PLAINTIFF</u>

"A false representation does not have to be made directly to [plaintiff]. If you find that [defendant] made a false representation to another person or a group of people with the intention that it would be communicated to [plaintiff], then you may find that [defendant] made a false representation to [plaintiff]."

(Capitalization and underline in original.)

When read together, those instructions did not allow the jury to find that plaintiff could recover for fraud based on defendant's simple nondisclosure of facts; rather, there had to be a qualifying word or act that defendant intended plaintiff to receive and rely on, and evidence that plaintiff did so rely.[6] A jury could not have followed those instructions and concluded that plaintiff proved a fraud claim based simply on defendant's internal decision to not disclose facts about smoking or its filtered cigarettes.

Finally, defendant asserts that the instruction erroneously did not require the concealment to relate directly to plaintiff, that is, defendant asserts that fraud by concealment is only actionable if defendant's concealing act created a false impression, covered up the truth, or removed an opportunity to discover the truth for plaintiff.

We reject defendant's assertion based on our discussion above. A plaintiff is not required to prove that any

---

[6] Contrary to defendant's assertions, we do not agree that the trial court believed that the instruction allowed for recovery on a simple nondisclosure theory. After seeming to agree with defense counsel's assertion that it would so allow, plaintiff's counsel clarified that the instruction was for intentional concealment, and the court stated that it understood.

concealment related directly to plaintiff. Under Oregon law, in these circumstances, plaintiff needed to prove only that he was within the class of individuals that defendant intended would rely on the false impression it created through its words and conduct concealing the truth about smoking and cigarette filters. In fact, the jury was so instructed, and defendant has not challenged that instruction. In addition, the jury was instructed that plaintiff had to reasonably rely on defendant's misrepresentations and the factors to consider for that determination. Defendant does not explain why the definition of false representation—concealment needed to be made specific to plaintiff, in light of the other instructions on fraud given to the jury.

Accordingly, we reject defendant's challenge to the trial court's jury instruction on fraudulent concealment.

Affirmed.